Arthur **SPUHL**, Appellant,

v.

**SHILEY, INC.**, Respondent.

No. 57303.

Missouri Court of Appeals,
Eastern District,
Division Five.

Aug. 14, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 19, 1990.

Application to Transfer Denied
Oct. 16, 1990.

Stephen H. Ringkamp, The Hullverson Law Firm, St. Louis, for appellant.

Barry A. Short, Lewis, Rice & Fingersh, St. Louis, for respondent.

SIMON, Judge.

Plaintiff-appellant, Arthur Spuhl (Spuhl), appeals from a summary judgment entered on September 1, 1989 in favor of defendant-respondent, Shiley, Inc. (Shiley), against Spuhl as a separate plaintiff, on his action to recover for the infliction of emotional distress sustained as a result of the implantation of two allegedly defective 60 degree Convexo–Concave prosthetic heart valves manufactured by Shiley. Spuhl sought recovery for a failure to warn under the theories of strict liability and negligence. Although additional plaintiffs are party to Spuhl's action, Shiley's motion for summary judgment and the trial court's order sustaining the motion are directed only to Spuhl as a separate plaintiff. Pursuant to Rule 74.01, the trial court made the express determination that "there is no just reason for delay since the summary judgment adjudicates and terminates the claim of plaintiff Spuhl against the defendant Shiley."

In his sole point on appeal, Spuhl alleges that the trial court erred in granting summary judgment in favor of Shiley because an actual fracture of an outlet strut is not a necessary element of a cause of action for infliction of emotional distress under the doctrine established in *Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. banc 1983), where Spuhl had two prosthetic valves implanted in his heart that were manufactured by Shiley and the outlet struts on the valves have a propensity to fracture, break loose, and kill the consumer as a result of defects caused by alleged improper welding and bending of the strut and alleged improper design of the strut which results in Spuhl living in constant fear of the fracture of his prosthetic heart valves and resulting death, and has caused emotional distress which is both medically significant and medically diagnosable.

On review of a grant of summary judgment, we scrutinize the record before us in the light most favorable to the party against whom the motion for summary judgment is requested and accord that party the benefit of every doubt. *Kemp Const. v. Landmark Bancshares*, 784 S.W.2d 306, 307 (Mo.App.1990). Reviewing the record in the light most favorable to Spuhl reveals the following facts.

On September 14, 1984, Spuhl underwent surgery to implant two Shiley 60 degree

Convexo–Concave prosthetic valves in place · of his own valves, which were defective due to a heart murmur caused by rheumatic fever as a child. Four or five months prior to surgery, Spuhl had begun to experience shortness of breath and gas pains. His physician, Dr. Perez, advised him that his rheumatic fever had resulted in a heart murmur which caused scar tissue to form on the heart valves so that they "either [do] not properly close or [do] not open as freely as they should." After several tests were performed by a cardiology group, Dr. Perez recommended the implantation of prosthetic heart valves. In his deposition submitted to the trial court with Shiley's motion for summary judgment, Spuhl stated that Dr. Perez discussed with him the surgical procedure and stated that the surgical risk of death was "50/50, like any major surgery." Spuhl stated that Dr. Perez did not tell him about any risks or postoperative problems that might result from the prosthetic heart valve implantation. The surgical procedure was performed by Dr. Kaiser, a cardiac surgeon. Spuhl stated in his deposition that he talked to Dr. Kaiser immediately prior to surgery about the risks of the operation, but that Dr. Kaiser told him "no more than Dr. Perez had already told [him]."

After surgery and a recovery period, Spuhl was able to return to work and has continued to work full-time since that time. In his deposition, Spuhl explained that after the surgery, "I pretty much did almost everything that I was doing before the surgery." He has had no reoccurrence of his previous symptoms.

On January 1, 1987, Spuhl watched the ABC television program "20/20," which contained a segment on the Shiley 60 degree Convexo–Concave prosthetic heart valves. The show's segment indicated that a percentage of the prosthetic heart valves had fractured. Subsequently, Spuhl was told about and saw various newspaper articles about failures of the Shiley 60 degree Convexo–Concave prosthetic heart valves. He also discussed the issue and exchanged information with other individuals he met as a result of a television interview.

Upon learning about the problems with the prosthetic valves, Spuhl immediately made an appointment with Dr. Kaiser for January 22, 1987. In a letter submitted to the trial court by Shiley in support of its motion for summary judgment, Dr. Kaiser informed Dr. Perez of his meeting with Spuhl. Dr. Kaiser stated that he had talked at great length with Spuhl about the possibility of valve fracture and had informed him that the incidence of valve fracture in prosthetic heart valves manufactured prior to his was 2/100 of one percent (0.02%), based on a letter from Shiley dated November 24, 1986. Furthermore, Dr. Kaiser stated that he had performed a physical examination which revealed "the valve to be working satisfactorily" and that he thought Spuhl was relieved after the discussion. Dr. Kaiser's letter further stated that Spuhl's prosthetic heart valves had been manufactured in January and April of 1984.

In his deposition, Spuhl testified that after viewing the "20/20" segment, he began to constantly "listen to hear if [the prosthetic heart valve is] still clicking." This constant awareness began to interfere with his day to day functions. He tended to be very short tempered and less patient with his co-workers and tried to avoid doing things that he would have attempted in the past, such as moving furniture. He also began to experience trouble sleeping. Spuhl explained that he often thinks throughout the day: "I'm still clicking, is that machine still working? And you almost hold your breath for a second which seems like an eternity until you hear the thing, click, click, click. You know, well, yes, I'm still alive."

During the period that he found out about the valve failures, Dr. Perez, whom Spuhl continued to see regularly, prescribed sleeping pills for Spuhl's sleeping problem. Spuhl also discussed with him the possibility of visiting a psychiatrist. However, Spuhl has not seen a psychiatrist since viewing the "20/20" segment. Furthermore, Spuhl stated in his deposition that neither Dr. Perez nor Dr. Kaiser, in their discussions with Spuhl about his con-

cern of valve failure, have made a medical diagnosis of his anxiety condition.

On February 4, 1987, a petition containing Spuhl's claim was filed in two counts alleging infliction of emotional distress which was medically diagnosable and medically significant. Three other counts dealt with the claims of another claimant and the sixth count prayed for punitive damages. Count I based recovery upon the theory of strict liability for failure to warn of the unreasonably dangerous and defective condition of the product. Count II sought recovery on the theory of negligent failure to warn of the product's dangerous condition. The petition alleged that the Shiley 60 degree Convexo–Concave prosthetic heart valve had and has the propensity to fracture at the outlet strut due to improper manufacturing procedures and then travel through the body of the consumer creating a serious risk of injury or death. The petition was twice amended to add additional claimants and their claims, but the amendments did not substantively change Spuhl's claim.

On April 14, 1987, Shiley filed its motion to dismiss the original petition for failure to state a claim for which relief can be granted. In its motion, Shiley presented four grounds for relief, including two which dealt with the claims of another plaintiff and the recovery of punitive damages. The other two grounds stated that plaintiffs had not alleged that their prosthetic heart valves had failed or malfunctioned, therefore, they had not suffered any actionable injury or damage and that furthermore, plaintiffs had not alleged any physical injury in Counts I and II of their petition. The motion court overruled Shiley's motion to dismiss on May 19, 1987 without setting forth the grounds for its order. Subsequently, Shiley filed an answer specifically denying Spuhl's allegations concerning the unreasonably dangerous and defective condition of Shiley's prosthetic heart valves.

On June 28, 1989, Shiley filed a motion for summary judgment to dismiss Counts I and II of Spuhl's Second Amended Petition. The motion set forth the following grounds: (1) Spuhl has no cause of action since his artificial heart valve is functioning properly and has not failed, malfunctioned or caused an accident which injured the plaintiff; (2) Spuhl has no cause of action for becoming worried, as a result of viewing a television program, that his artificial heart valve, which is functioning properly to save his life, might fail at some unknown future time; (3) nine other jurisdictions had summarily dismissed factually and legally identical claims on the ground that no cause of action existed; and (4) the creation of the cause of action that plaintiff puts forth would contravene established law in Missouri that product liability causes of action should not be allowed to expand when they would have an adverse impact on pharmaceutical research and development.

In support of its motion, Shiley filed a memorandum of law, the deposition of Spuhl, the letter of Dr. Kaiser, and affidavits of Steven S. Lewis, a biostatistics consultant for Shiley, and of Dr. Jeffrey M. Piehler, a thoracic and cardiovascular surgeon. The affidavits of Lewis and Dr. Piehler establish the statistical risk of strut fracture in Spuhl's prosthetic valve group and the estimated risk of operative and post-operative death for valve replacement recipients as a group. In opposition to Shiley's motion, Spuhl filed a memorandum of law and the deposition of George Sherry (Sherry), who was an engineer for Shiley from August 1981 to September 1983. The Sherry deposition contained testimony as to the existence of problems in the valve manufacturing process and Shiley's knowledge of these problems. In addition to the memoranda filed, each party filed a reply memorandum. On September 1, 1989, the trial court entered an order on Shiley's motion for summary judgment which stated: "Upon consideration this Court sustains defendant's [Shiley's] motion for summary judgment ... [o]n Counts I and II of plaintiff's [Spuhl's] second amended petition." Counts I and II of Spuhl's Second Amended Petition were dismissed and this appeal followed.

The entry of summary judgment is permitted to be entered "if the pleadings, dep-

ositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 74.04(c). Accordingly, our review of a summary judgment is a two step process: first, whether there is a genuine issue of material fact requiring trial, and second, whether the prevailing party was entitled to judgment as a matter of law. *Kaufman v. Bormaster*, 599 S.W.2d 35, 37[4, 5] (Mo.App.1980). If a genuine issue of material fact exists, summary judgment cannot be granted. A genuine issue of fact exists whenever there is the slightest doubt about the facts. *Kaufman*, 599 S.W.2d at 37[4, 5]. The fact in doubt must be a material one which has legal probative force as to a controlling issue. *Id.* Furthermore, a party confronted with a summary judgment motion supported by affidavits must set forth specific facts showing that there is a genuine issue of fact for trial. *Steinberg v. Fleischer*, 706 S.W.2d 901, 904[1] (Mo.App.1986).

We note that the trial court's grant of summary judgment dismissed Spuhl's strict liability failure to warn and his negligent failure to warn claims. In its motion for summary judgment and again on appeal, Shiley's main contention is that Spuhl has no cause of action because his prosthetic heart valves have not failed, malfunctioned or caused an accident which injured Spuhl. On appeal, Spuhl argues that an actual fracture of an outlet strut is not a necessary element of his cause of action for infliction of mental distress under the doctrine established in *Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. banc 1983).

■ Under Missouri law, a plaintiff may initiate a failure to warn claim under a negligence theory or a strict liability theory premised on Restatement (Second) of Torts section 402A (1965). *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 383[3] (Mo. banc 1986). In negligence, the duty owed is based on the forseeability of the harm that is a likely result from manufacturers' acts or omissions. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607[4]

(Mo. banc 1977). Thus, the existence of knowledge and fault are relevant considerations in a negligence claim. *Hill v. Air Shields, Inc.*, 721 S.W.2d 112, 117[6]. However, strict liability is based in part on the "reasonably anticipated" use of the product, *Blevins*, 551 S.W.2d at 607[4], and the condition, or dangerousness, of the product, *Hill*, 721 S.W.2d at 117[6]. Strict liability focuses on the product, while negligence focuses on the conduct of the manufacturer. *Racer v. Utterman*, 629 S.W.2d 387, 395[11] (Mo.App.1981). Although negligence and strict liability are separate and distinct theories, the same operative facts may support recovery under either theory, particularly in a failure to warn case. *Hill*, 721 S.W.2d at 118[7].

■ In strict liability, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property." *Richardson v. Holland*, 741 S.W.2d 751, 753[3] (Mo.App.1987), quoting *Restatement* section 402A(1). Under comment j to section 402A a product may be rendered unreasonably dangerous because of the absence of a warning as to its use. *Racer*, 629 S.W.2d at 393[1]. A product may be found to be "unreasonably dangerous" and actionable under *Restatement* section 402A when it is "defective and dangerous when put to a use reasonably anticipated." *Hill*, 721 S.W.2d at 117[5], citing *Keener v. Dayton Electric Mfg. Co.*, 445 S.W.2d 362, 366[7] (Mo.1969).

In a negligence claim, plaintiff must establish: (1) a duty on the part of defendant to protect plaintiff from injury; (2) failure of defendant to perform that duty; and (3) injury to plaintiff resulting from such failure. *Hill v. General Motors Corp.*, 637 S.W.2d 382, 384[2] (Mo.App.1982). Missouri clearly recognizes that a manufacturer has the duty to warn ultimate users of its products or articles which are inherently dangerous or are dangerous because of the use to which they are put. *Id.* at 384[3]. In *Morris v. Shell Oil Co.*, 467 S.W.2d 39, 42 (Mo.1971), Missouri adopted Restate-

ment (Second) of Tort section 388 (1965), which provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

As previously noted, Spuhl sought to recover in Count I of his Second Amended Petition for a failure to warn of a product in an unreasonably dangerous and defective condition under a strict liability theory and in Count II of his Second Amended Petition for a failure to warn of the dangerous condition of a product when put to a reasonably anticipated use. More specifically, Count I states, in relevant part, that:

3. Said Shiley heart valve implants were then in a defective condition unreasonably dangerous when put to a reasonably anticipated use.

4. Said Shiley heart valve implants were used in a manner reasonably anticipated.

5. Such implants were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics.

6. An adequate warning of the danger involved in the use of said heart implants was not given.

7. Such implants had and have the propensity to fracture at or near a certain retaining pin which is a part of said device and said retaining pin has the propensity to travel through the arteries and veins of the consumer creating seri-

ous risk of injury or death. Such implants are and have been unreasonably dangerous by virtue of welding said retaining pin rather than forming said device out of one piece, improper welding procedures and inspection procedures, and manipulating and bending said retaining pin in the course of manufacture.

8. As a direct result of defendant's product being sold without an adequate warning, and/or as a direct result of the defective condition of said product, plaintiff lives in constant fear of said retaining pin fracturing and causing serious injury or death and has suffered and will continue to suffer severe emotional distress which is medically diagnosable and medically significant; plaintiff has incurred medical expenses and will continue to do so in the future; his ability to work, labor, earn wages and enjoy life has been and will in the future be impaired and limited; he has suffered and will suffer pain, particularly mental agony, all to his injury and damage.

Count II states, in relevant part, that:

3. Said Shiley heart valve implants had a retaining pin which had a propensity to break due to welding, improper welding, and manipulation and bending during the manufacturing process and were therefore dangerous when put to a reasonably anticipated use.

4. Said heart implants were used in a manner reasonably anticipated.

5. Plaintiff did not know, and by using ordinary care could not have known, of such dangerous condition.

6. Defendant knew, or by using ordinary care could have known, of such dangerous condition.

7. Defendant failed to warn or remedy such dangerous condition.

8. Defendant was thereby negligent, in one or more of the respects submitted above.

9. As a direct result of such negligence, plaintiff sustained damage as more fully set forth in Count I of this Petition.

In its answer to Spuhl's allegations in Count I and II of his Second Amended

Petition, Shiley denies that its prosthetic heart valves are in an unreasonably dangerous and defective condition. In support of its denial, Shiley filed with its motion for summary judgment the affidavits of Lewis and Dr. Piehler, which directly address the issue of the defectiveness and dangerousness of Shiley's prosthetic heart valves.

The Lewis affidavit stated that, based on accepted statistical methodology, the calculated probability of a strut fracture in Spuhl's valve group is $2/100$ of one percent (0.02%) per annum. The Piehler affidavit opined that a reasonable estimate of the average risk of death during any heart valve replacement surgery is 5% per annum and a reasonable estimate of the average risk of post-operative death for heart valve recipients as a group is 4% per annum. When these two affidavits are contrasted, Spuhl's risk of death due to strut fracture is lower than his risk of operative and post-operative death due to his valve replacement.

In response to Shiley's affidavits and in support of his allegation as to the unreasonably dangerous and defective condition of Shiley's prosthetic heart valve, Spuhl filed the deposition of Shiley's former engineer, Sherry. Sherry testified that in 1981 his superior informed Sherry that Shiley was having problems with weld fractures. During that period, Sherry worked with the final assembly product drawing for the prosthetic heart valve and discovered that the "individual components when joined together would not result in the finished product as dictated by the assembly drawing." Sherry made these findings known to his supervisor. After January 1982, Sherry supervised a phase of the assembling process. In the course of his supervision, Sherry observed inconsistent welds, worn weld fixtures, crooked outlet struts, flanges with burrs present in the holds after drilling, dissimilar weld fixtures made from identical design drawings, and outlet struts that incorrectly came in contact with weld fixtures. Sherry further discovered that welding of the component parts took place in an open environment with no protection from contaminants that might be present in the room and that the welders were not certified. Sherry testified that many of the inconsistent welds were rewelded due to fractures, while others were merely polished to eliminate surface cracks on the welds, which resulted in overlapping welds and in thin welds. Sherry also testified that outlet strut fractures would occur due to multiple bending of the strut during the manufacturing process. Sherry stated that he left Shiley in September 1983 because he had informed his supervisors of the various problems in the valve manufacturing process and no action was being taken to correct the situation.

Our review of the record discloses that Shiley, through its answer and affidavits on summary judgment, denies the existence of an unreasonably dangerous and defective condition as to its prosthetic heart valves. Further, the record reveals that Spuhl, in response to Shiley's affidavits, has set forth specific facts indicating that Shiley's prosthetic heart valves are unreasonably dangerous and in a defective condition due to irregularities in the manufacturing process. Therefore, there exists a factual dispute between Spuhl and Shiley as to the unreasonably dangerous and defective condition of Shiley's prosthetic heart valves.

■ However, this factual dispute is not dispositive of either count, because to preclude summary judgment the factual dispute must be of such legal probative force as would control or determine the litigation. *Roberts Fertilizer, Inc. v. Steinmeier*, 748 S.W.2d 883, 887[3] (Mo.App.1988). In essence, the fact in doubt must be a material one. *Hill*, 721 S.W.2d at 115. Here, the factual issue as to the unreasonably dangerous and defective condition of Shiley's prosthetic heart valves is not controlling.

Shiley argues that a failure, malfunction or accident involving the product which injured the plaintiff is the hallmark of every Missouri product liability case, under any theory. Since it is undisputed that Spuhl's prosthetic heart valves have not malfunctioned causing him injury, Shiley contends that Spuhl has no valid cause of action in

product liability. Conversely, Spuhl argues that to state a claim for relief for infliction of emotional distress a failure or malfunction of the product is not needed.

In considering Count I of Spuhl's Second Amended Petition, we are mindful that Missouri has recognized a strict liability failure to warn theory of recovery under *Restatement* section 402A. *See Racer*, 629 S.W.2d at 395[11]. An essential element of any strict liability claim under section 402A is that the product at issue be in a defective condition. *Restatement* section 402A(1). "A product is in a 'defective condition' where the condition is one not contemplated by the ultimate consumer (Restatement (Second) of Torts Section 402A comment g (1965)), which condition causes the product *to fail* to perform in the manner reasonably to be expected in light of its nature and intended function." *Richardson*, 741 S.W.2d at 754[3] (emphasis ours). Thus, the doctrine of strict liability under *Restatement* section 402A is not applicable unless there is a product failure or malfunction.

Our review of Count I shows that although Spuhl has alleged that his prosthetic heart valves have specific defects, he has failed to allege that his prosthetic heart valves have malfunctioned. Presently, Spuhl is unable to allege and maintain a claim for relief for strict liability failure to warn, because his prosthetic heart valves have not failed or malfunctioned so as to be in a "defective condition" under *Restatement* section 402A. Accordingly, Spuhl has failed to plead a claim for relief in strict liability failure to warn. Thus, the trial court properly granted summary judgment in favor of Shiley on Count I.

We next determine whether the existence of a factual dispute concerning the defectiveness and dangerousness of Shiley's prosthetic heart valves is material in light of the negligent failure to warn claim stated in Count II of Spuhl's Second Amended Petition. As with Count I, Shiley argues that a failure or malfunction of the product is required in every product liability case, even under a negligent failure to warn theory.

As we previously stated, Missouri has recognized *Restatement* section 388 as setting forth a cause of action for negligent failure to warn. *See Morris*, 467 S.W.2d at 42. On its face, *Restatement* section 388 does not require a failure or malfunction of the product in order to maintain a claim for negligent failure to warn. Moreover, MAI 25.06, the pattern instruction used to submit a claim of negligent failure to warn and tracked by Spuhl in pleading negligent failure to warn in Count II, asks that the defect or hazard be described "such as a wheel constructed with improperly tempered steel which had a *propensity* to break." (emphasis ours). Again, on its face, the suggested instruction does not require a specific finding that the product malfunctioned or failed. However, our review of negligent failure to warn cases has disclosed no case in Missouri in which the product in question did not malfunction, fail, or result in injury to the plaintiff. *See, Yocum v. Piper Aircraft Corp.*, 738 S.W.2d 145 (Mo.App.1987) (defective stabilator trim tab system failed in aircraft and resulted in death); *Hill v. Air Shields, Inc.*, 721 S.W.2d 112 (Mo.App. 1986) (defective design of incubator oxygen flag which resulted in excessive exposure to oxygen); *Hill v. General Motors Corp.*, 637 S.W.2d 382 (Mo.App.1982) (modified suspension system caused vehicle to overturn which resulted in injury and death); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.App.1978) (defective fast idle cam malfunctioned and caused vehicle to accelerate which resulted in a collision); *Morris v. Shell Oil Co.*, 467 S.W.2d 39 (Mo.1971) (dangerous solvent sold without warning which resulted in contact dermatitis). Consequently, we must conclude that, although not expressly set forth in *Restatement* section 388 or MAI 25.06, product malfunction or failure is an essential element of a claim for negligent failure to warn.

Recovery for emotional distress without physical injury or impact should be governed by the application of general tort principles, such as foreseeability, duty, breach, and proximate cause. *See, Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d

916, 167 Cal.Rptr. 831, 834, 616 P.2d 813, 816[1] (1980) (relied on in *Bass*, 646 S.W.2d at 772[3]); F. Harper, F. James, & O. Gray, 3 The Law of Torts section 18.4 (2d ed. 1986); Nolan and Ursin, Negligent Infliction of Emotional Distress: Coherence Emerging From Chaos, 33 Hasting L.J. 583, 620–1 (1982); Comment, Molien v. Kaiser Foundation Hospitals: California Expands Liability for Negligently Inflicted Emotional Distress, 33 Hastings L.J. 291, 312 (1981). Review of Count II reveals that Spuhl has failed to allege that his prosthetic heart valves have malfunctioned or failed. Accordingly, Spuhl has failed to plead a claim upon which relief can be granted for negligent failure to warn. Therefore, the trial court properly granted summary judgment in favor of Shiley on Count II.

Judgment affirmed.

CRANDALL, C.J., and JOSEPH J. SIMEONE, Senior Judge, concur.