804 F.Supp. 1134 (1992)
Keith SPERRY, Plaintiff,
v.
BAUERMEISTER, INC., Defendant.
No. 90-2308 C (5).
United States District Court, E.D. Missouri, E.D.
October 14, 1992.
*1135 *1136 Robert M. Susman, Raskas, Ruthmeyer, Pomerantz, Wynne, Garavaglia & Susman, St. Louis, Mo., for plaintiff.
David E. Larson, Kristine S. Focht, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has brought a products liability action against defendant for personal injuries he sustained when he attempted to manually clean a spice mill. Plaintiff's Complaint is in three counts: Count I  strict liability for defective manufacture and design; Count II  strict liability for failure to warn; and Count III  negligence (design and failure to warn). This matter is before the Court on the defendant's motion for summary judgment. Responsive pleadings have been filed.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
At all relevant times, plaintiff was employed at Spicecraft doing maintenance work. His work included the operation and cleaning of the mill which was used to grind spices. On September 2, 1988 plaintiff was operating the mill when, at some point in time, it required cleaning.
Cleaning the spice mill involves scraping the uppermost portion of the spice mill known as the "turbo" and another portion *1137 of the mill known as the "hopper". The operator (or whomever is doing the cleaning) takes out the airlock located below the hopper, runs the auger (a rotating metal component part) to the sifter backwards, and taps the pipe housing the auger to the sifter with a hammer (ostensibly to loosen the packed-on spice).
On the day of the accident, plaintiff shut off the machine, accessed the turbo and scraped the inside of the mill housing with a putty knife. He then removed the airlock and reached down into the throat of the mill. Evidently before plaintiff reached through the airlock into the throat, plaintiff reactivated the sifter and the auger. In reaching through the airlock into the throat of the mill system, plaintiff's right hand made contact with the running rotating auger. The auger amputated three fingers on plaintiff's right hand.
The mill is composed of many component parts. The defendant and another component part manufacturer, Micron Powder Systems, supplied many of the component parts utilized in the spice mills operated by Spicecraft. In October 1980, Micron supplied an airlock to Spicecraft. This airlock was Model 6022 with Serial No. 80516A1 (Airlock 1). At the time of the purchase of Airlock 1, Spicecraft had one mill known as the old Bauer Mill. In November 1991, Micron supplied defendant with an identical airlock with Serial No. 81632A1 (Airlock 2). Approximately at this time, Spicecraft assembled a second mill known as the new Bauer Mill. The assembly of the new Bauer Mill consisted of purchasing certain component parts from Bauermeister, which included Airlock 2.
Both mills were capable of operation at the time of plaintiff's accident. The component parts, including the airlock, are interchangeable, and in fact were regularly interchanged. The two airlocks were the same model but with different serial numbers.
The plaintiff was injured on the new Bauer Mill. When defendant inspected the new Bauer Mill on May 24, 1991 (three years after the accident), it contained Airlock 1. No one knows which airlock the new Bauer Mill contained when plaintiff was injured.
Defendant not only supplied Spicecraft with an airlock but also several other component parts connected with the airlock. None of these component parts were to be located below the airlock in the area where plaintiff was injured. Defendant offered to sell to Spicecraft a "more complete system" which would have included electrical controls, as well as an interlock safeguard (i.e. a safety cut-off switch which would have prevented operation of the auger when the airlock is opened or removed). This offer of a "more complete system" was rejected by Spicecraft. When defendant sold its component parts to Spicecraft, Tim Hardin (defendant's sales representative) sent to Spicecraft two copies of drawings showing examples of a control system. In his letter to Mr. George Vogt (then plant manager of Spicecraft), Mr. Hardin stated "[h]owever, please understand that this is only an example, and that the system you design is your responsibility." Defendant's Exhibit F (to defendant's motion)  Affidavit of Tim Hardin and attached exhibits.
The Bauermeister component parts arrived at Spicecraft unassembled. The spice grinding and dust control system was assembled and installed exclusively by Spicecraft employees. No technical assistance was provided by defendant nor was any requested by Spicecraft from defendant. Defendant's Exhibit H  Affidavit of Jack Foreman (Spicecraft employee responsible for the assembly and installation of the new Bauer Mill). Spicecraft chose to have the electrical wiring for the new Bauer Mill designed and installed by Triplett Electric. An electrician for Triplett, John Sprague, did the actual electrical work according to the specifications of Spicecraft personnel. He had no contact with anyone nor saw any design drawings for the new Bauer Mill from defendant. Defendant's Exhibit G  Affidavit of John Sprague.
Spicecraft specifically requested Sprague to design and install controls in such a way that, while in the automatic mode, an interlock system was in use which would automatically shut down all parts behind another *1138 part that ceased to operate due to malfunction or any other reason. In addition to the automatic mode, Spicecraft specifically requested Sprague to design and install a method to by-pass the automatic sequence to a manual mode to enable certain parts of the machinery to continue to operate while others were shut down for cleaning and/or maintenance. As requested, Sprague designed and installed a control box and electrical system (with related wiring) which allowed an operator to select specific parts of the system to activate, while other parts were shut off. Such a system constitutes a manual function with an interlock override. Defendant had absolutely no input into the design, assembly, or installation of the electrical system, including the control panels and related wiring.
In plaintiff's First Amended Complaint, he alleges:
9. That the said machine was sold, manufactured, designed, assembled and installed in a defective manner in that;
a. It lacked a warning light which would advise an operator that the auger was on;
b. It lacked an interlock system to prevent the operation of the auger when the airlock was removed;
c. It lacked an interlock system to prevent the operation of the auger when any of the components of the machine were disassembled.
Plaintiff does not allege any defect in the airlock itself but rather a defect in the overall design of the mill in that it lacked an interlock system and a warning light. Defendant contends that it is nothing more than a components part manufacturer and seller and that it did not design or install the new Bauer Mill. Furthermore, the alleged defects regard the electrical system which it did not design or install. Finally, defendant contends that plaintiff fails to allege that any of the component parts that defendant did supply to Spicecraft were defective, therefore defendant is relieved of any duty to warn.
Under Missouri products liability law, a plaintiff has available three theories of recovery: strict liability, negligence, and breach of warranty. Linegar v. Armour of America, 909 F.2d 1150, 1152-53 (8th Cir.1990). In the present case, plaintiff's cause of action is brought both in strict liability in tort and negligence as regards his allegations of design defect and failure to warn. Strict liability focuses upon the product itself, while negligence focuses on the conduct of the manufacturer. Spuhl v. Shiley, Inc., 795 S.W.2d. 573, 577 (Mo.App. 1990); Racer v. Utterman, 629 S.W.2d. 387, 395 (Mo.App.1981). Although the two theories are separate and distinct, the same operative facts may support recovery under either one of the theories. Spuhl, at 577.

Design Defect
Under the Missouri law of strict liability in tort for defective design, in order to establish liability of the seller or manufacturer, a plaintiff must demonstrate that 1) the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer and 2) the plaintiff sustained injury or damage as a direct result of the defect. Lewis v. Envirotech Corp., 674 S.W.2d 105, 110 (Mo.App.1984); see also, Church v. Martin-Baker Aircraft, 643 F.Supp. 499, 504 (E.D.Mo.1986). The plaintiff has the burden to show the defect existed when the product left the control of the manufacturer and entered the stream of commerce. Lewis, at 110. Consequently, a supplier is not liable when it delivers a product in a safe condition but subsequent mishandling or alteration renders the product defective. Donahue v. Phillips Petro., 866 F.2d. 1008, 1010 (8th Cir.1989) citing Porter v. C.A. Dawson & Co., 703 F.2d 290 (8th Cir.1983) and Williams v. Ford Motor Co., 494 S.W.2d. 678 (Mo.App.1973). Nor is a seller strictly liable for injury caused by a defect created by a third-party. Winters v. Sears, Roebuck, & Co., 554 S.W.2d 565 (Mo.App.1977).
In negligent design defect cases, the plaintiff must prove that a defendant breached its duty of care in the design or manufacture of a product, and that this breach was a proximate cause of plaintiff's *1139 injury. Church, at 504; Blevins v. Cushman Motors, 551 S.W.2d 602 (Mo. banc 1977); Spuhl, at 577.
The most significant issue of material fact in this case is the problem of what constitutes the product sold by the defendant to Spicecraft. Plaintiff circumvents this fact issue and instead focuses his attention elsewhere. He believes that the issue central to this case is the question of who designed the mill. His entire case is based upon the premise that the defendant is the designer of the "mill system". His allegations concern the overall design of the mill as a whole in that it lacked an interlock and a warning light. However, the evidence before the Court clearly shows that the defendant was not the designer, manufacturer, or installer of the entire mill system. Instead the record before the Court shows that the "product" sold by defendant were specifically requested component parts which were integrated, by a third-party, into a mill.
The evidence shows that the mill system is actually a milling operation composed of separate "systems" interfacing with one another in order for the entire process of grinding spices to be accomplished. Each "system" is made up of component parts that are supplied and/or installed by one or more individuals or companies.
The parties' affidavits, deposition exhibits, and other documents convince this Court that the "designer" of the entire milling system known as the new Bauer Mill was Spicecraft. Spicecraft contracted with defendant solely for the provision of certain component parts for the "spice grinding and dust control system". The component parts sold by defendant did not include electrical controls. Electrical controls would have included an interlock safeguard. Bauermeister offered a more complete spice grinding and dust control system which would have included electrical controls (and an interlock safeguard) to Spicecraft, but Spicecraft opted not to purchase it from the defendant. Instead, Spicecraft contracted with a third-party to design and install the "electrical system" which included a manual override to the interlock safeguard. Spicecraft went to different entities for different components of the various systems which it ultimately put together to make the new Bauer Mill. Spicecraft simply took different parts and put them together the way it wanted to until it made the complete mill system known as the new Bauer Mill.
Plaintiff has provided no evidence that any of the component parts that defendant sold to Spicecraft were defective when sold. Furthermore, plaintiff has provided no evidence that any of the component parts sold by defendant was the proximate cause of plaintiff's injury. Instead, plaintiff's evidence is only that the milling system as a whole was defective because it (the milling system) lacked an interlock and/or a warning light. However, the evidence clearly shows that defendant provided only certain non-defective component parts which were then integrated into a larger milling operation. Plaintiff does not allege that the integration of these component parts rendered the overall mill operation defective or that the integration itself was in some way defective.
The only evidence linking the defendant with any aspect of the mill's design are two copies of drawings of a milling system[1]. Mr. Hardin's letter to Mr. Vogt clearly defines these drawings as simply examples of how the spice grinding and dust control system sold to Spicecraft might be incorporated into a complete mill. Since none of Spicecraft's personnel consulted these drawings or sought technical assistance from defendant, the Court must surmise that Spicecraft had its own ideas as to how it wished its mill to operate. This is supported by the fact that Spicecraft contracted with an independent electrician to design and install the electrical controls for the milling system. According to Mr. Sprague's affidavit, Spicecraft wanted him to design and install a manual override to *1140 an interlock. Plaintiff does not contest this fact.
Other than supplying the component parts for the spice grinding and dust control system as requested by Spicecraft, plaintiff has no evidence that defendant had anything to do with the overall design of the mill. Plaintiff attempts to buttress his contention that defendant designed the mill by offering selected portions of the deposition of Mike Olewinski, defendant's sales representative. Mr. Olewinski did testify that there was only one way, as far as he knew, for the component parts sold by defendant to fit into a mill. The Court disagrees with the plaintiff that this statement by Mr. Olewinski proves that defendant designed the entire mill. It is clear that Mr. Olewinski was simply acknowledging the fact that defendant's non-defective component parts would fit into the mill one way, not that defendant had the responsibility of designing the entire mill and deciding how component parts of other manufacturers would fit in also. In fact this is disproven by the fact that Spicecraft went to another party to design and install the electrical controls according to Spicecraft's specifications, not the defendant's specifications. This Court has already determined that under current Missouri products liability law, a component parts manufacturer cannot be held liable for the incorporation of its non-defective component part(s) into a defectively designed larger mechanical system. Sperry v. Bauermeister, 786 F.Supp. 1512, 1516-17 (E.D.Mo. 1992).
Plaintiff has no evidence that Bauermeister's component parts were in a defective condition unreasonably dangerous for use when sold to Spicecraft or that Bauermeister had the responsibility for the overall design of the mill as a whole, including the installation of an interlock and a warning light. Plaintiff has failed to carry his burden of proof on his claims of product design defect under strict liability and negligence.

Failure to Warn
Missouri courts recognize a cause of action for negligent failure to warn, i.e. failure to warn of the dangerous condition of a product when put to a reasonably anticipated use. Morris v. Shell Oil Co., 467 S.W.2d 39 (Mo.1971); Spuhl, at 580. Missouri law also recognizes a strict liability failure to warn theory of recovery under Restatement of Torts, § 402A, i.e. a manufacturer or distributor may be strictly liable for damages resulting from the use of its product, even if the product itself lacks a design defect. The lack of a warning is what renders the product defective or unreasonably dangerous. Donahue v. Phillips Petroleum, 866 F.2d 1008, 1011 (8th Cir.1989); Church, at 508; Spuhl, at 580; Racer, at 395. Under both theories of recovery, an essential element of a claim is product failure or malfunction.
Plaintiff Sperry cannot support his claims for negligent failure to warn or strict liability failure to warn because he has no evidence that the component parts supplied by defendant were in any way defective or that a lack of warning rendered any of the component parts supplied by defendant defective or unreasonably dangerous. Furthermore, plaintiff cannot establish liability of defendant because the lack of a warning rendered the overall mill system defective. Defendant had no connection with the design or installation of the electrical system which would have included an interlock safeguard and/or a warning light; consequently it had no duty to warn plaintiff of any dangerous condition of the electrical system or the overall design of the mill. Finally, plaintiff has no evidence that any of the component parts sold by defendant failed or malfunctioned causing plaintiff's injury.
The spice mill components, as originally sold to Spicecraft by defendant, were not the proximate cause of plaintiff's injuries as alleged in his First Amended Complaint. Plaintiff, as a matter of law in Missouri, cannot meet his burden of proof with respect to the material elements for a product liability design and failure to warn cause of action. He cannot, as a matter of law in Missouri, show any duty owed and breached by defendant. Defendant has *1141 carried its burden of proof in demonstrating that no issue of material fact exists with regard to its sale of non-defective component parts to a third-party who integrated these parts into an allegedly defectively designed larger mechanical system. Since this Court finds, that as a matter of fact, the component parts sold by Bauermeister were not defective, and as a matter of law, that Bauermeister cannot be held liable for the incorporation of its non-defective component parts into a mill allegedly defectively designed by a third-party, Bauermeister's summary judgment motion must be granted.
NOTES
[1] Neither of the parties provided the Court with copies of the drawings; however there is ample evidence from submitted deposition testimony and documents regarding these drawings for the Court to understand fully the nature of these drawings.