Sandra CROSSFIELD, Appellee,

v.

QUALITY CONTROL EQUIPMENT
COMPANY, INC., Appellant.

No. 92–3794.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1993.

Decided Aug. 5, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 13, 1993.

Wendell E. Koerner, Jr., St. Joseph, MO, for appellant.

R. Edward Murphy, St. Joseph, MO, for appellee.

Before BOWMAN and MAGILL, Circuit Judges, and HENDREN,* District Judge.

MAGILL, Circuit Judge.

This is a products liability case with jurisdiction based on diversity of citizenship. A jury held Quality Control Equipment, Inc., (Quality) liable for injuries sustained by Sandra Crossfield while working on a chitterling cleaning machine. Crossfield was injured by the chain/sprocket mechanism of the machine. The jury awarded Crossfield the sum of $1,250,000.[1] Liability was grounded on theories of strict liability failure to warn and negligent failure to warn. On appeal, Quality argues that it is entitled to judgment as a matter of law because it had no duty to warn of a hazard arising in a larger, integrated machine system when it was merely the supplier of a non-defectively designed or manufactured component part to be incorporated into the machine system, which Quality played no role in manufacturing or designing. We agree that Quality had no duty to warn as a matter of law and we reverse the judgment below.

---

* THE HONORABLE JIMM L. HENDREN, United States District Judge for the Western District of Arkansas, sitting by designation.

1. The district court determined that Quality was responsible for only $915,000, after reducing the total award by $335,000 already paid to Cross-field in settlement by original co-defendant IMO Industries. IMO manufactured the chitterling cleaning machine's chain. Quality purchased the chain from IMO and resold it to Crossfield's employer.

## I. BACKGROUND

### A. The Accident

A chitterling cleaning machine is used in the pork processing business to clean out hog intestines. The dimensions of the entire machine are approximately 8 feet by 3 feet by 4 feet. The intestines are fed onto a pipe at the intake end of the machine. Directly above the pipe, running the length of the machine, is a conveyor chain running in an oval shape. There are sprockets at both ends of the machine to move the chain. The chain is equipped with ½ inch metal protrusions spaced every 1¾ inches. The protrusions on the chain contact the chitterling material and convey it through the machine along the pipe. The chitterlings are first cut lengthwise along the underside of the pipe, then they are pulled over baffle plates where water sprayers clean out the intestine material.

The chitterlings are conveyed through the machine to the discharge end. At the discharge end, the chitterlings lose contact with the pipe and are sprayed with a final blast of water. The intestine material is then supposed to drop off the chain into a discharge tray before the chain reaches the rear sprocket. The rear sprocket then contacts the chain and propels it upwards, around, and back towards the front end of the machine where it will begin the process anew. The chain, therefore, runs in a clockwise direction throughout the length of the machine.

In 1988, Sandra Crossfield was employed by Swift Independent Packing Company, presently known as Monfort Pork,[2] in its St. Joseph, Missouri, packing plant. Crossfield worked as a clipper at the discharge end of a chitterling cleaning machine in the plant. As the chitterlings come out the discharge end, they are deposited into a stainless steel tray. The clipper then cuts the chitterling material on a fixed blade mounted to the machine and throws it into another tray to be washed. The chitterling material, however, does not always simply drop off the chain after reaching the end of the pipe at the discharge end. Sometimes the material clings to the chain after losing contact with the pipe. When this happens, the clippers reach and remove the chitterlings from the chain with their hands.

On the day she was injured, June 2, 1988, Crossfield was wearing three pairs of gloves, which was standard practice. As the chain was moving at the discharge end of the machine, Crossfield noticed some chitterling material stuck to the chain before it reached the rear sprocket. Using her right hand, she reached for the material on the underside of the chain to loosen it. At that point, her glove became entangled in the chain and sprocket area. Her gloved hand was pulled by the chain around the sprocket and back towards the front of the machine. As she struggled to free her hand, Crossfield sustained serious injuries. Three of her fingers became detached from her hand. The fingers were ultimately reattached, but she has no feeling or functionality in them.

### B. Quality's Connection to the Accident

In 1983, Quality paid Strickler–DeMoss Manufacturing, Inc., $10,000 for the patent rights to chitterling cleaning machines previously manufactured and sold by Strickler–DeMoss. Strickler–DeMoss had sold the machines to meat processing plants.[3] In addition to the patent rights, Quality received a certain inventory of patterns, dies, and jigs. Quality, however, did not obtain a customer list from Strickler–DeMoss. Quality intended to sell replacement parts to existing owners of Strickler–DeMoss machines and to manufacture additional machines for sale.

Beginning in March 1984, Crossfield's employer began ordering replacement parts from Quality for its chitterling cleaning machines. From March 1984 to June 1988, Quality provided twenty-four separate orders for replacement parts to the Monfort St. Joseph plant. Included in those shipments were five separate orders for replacement

---

**2.** For ease of identification throughout this opinion, Crossfield's employer will be referred to as Monfort.

**3.** Although it was never conclusively established at trial, both parties assume that Strickler–DeMoss manufactured the particular machine on which Crossfield was injured and it was installed when the plant was built in 1972.

conveyor chains. The chains were not manufactured by Quality; Quality obtained the chains from the manufacturer and then resold them to Monfort and other customers. It is undisputed that Quality supplied Monfort with the chain which was on the machine the day of Crossfield's injury. The chain was specifically manufactured to fit Strickler–DeMoss chitterling cleaning machines.

Prior to June 2, 1988, no employee of Quality had ever seen the chitterling cleaning machine that injured Crossfield. In fact, no employee of Quality had ever even been to the Monfort facility in St. Joseph. Quality's only knowledge of Monfort's machines came from its correspondence regarding replacement parts. From the invoices and the parts ordered, Quality was aware that the Monfort plant used "old style" chitterling cleaning machines, presumably manufactured by Strickler–DeMoss. Quality also knew that the original design of the Strickler–DeMoss machine did not include any guards over the chains and sprockets.

From 1983 to 1985, Quality continued to manufacture chitterling cleaning machines without guards or kill switches at the discharge end. In 1985 and 1986, Quality redesigned the chitterling cleaning machine. The "old style" machines were the ones produced before this redesign. The redesign provided additional safety features including guards over the chain at both the intake and discharge ends of the machine and kill switches that would automatically shut the machine down if the guards were lifted. These safety features were added because Quality was concerned that there might be a possibility of an entanglement hazard involving the chain and the sprocket at the discharge end.

## II. ANALYSIS

■ Missouri substantive law controls this case. Crossfield sued Quality alleging strict liability failure to warn and negligent failure to warn, both valid theories under Missouri law. *See Sperry v. Bauermeister, Inc.*, 804 F.Supp. 1134, 1140 (E.D.Mo.1992) (*Sperry II*), *appeal docketed*, No. 92–3626 (8th Cir. June 18, 1993); *Spuhl v. Shiley, Inc.*, 795 S.W.2d 573, 577 (Mo.Ct.App.1990). Originally, Crossfield also sought to impose liability on Quality based on a theory of successorship due to Quality's relationship with Strickler–DeMoss, but this theory was abandoned before submission to the jury.

■ For a plaintiff to prove either strict liability failure to warn or negligent failure to warn, she must show that the product is defective and unreasonably dangerous for its reasonably anticipated uses. *See Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 382 (Mo.1986) (en banc); *Sperry II*, 804 F.Supp. at 1140. Plaintiff's theory is that the chain was unreasonably dangerous for its reasonably anticipated uses (and thus defective) because it lacked a warning stating that it could be hazardous when used in a chitterling cleaning machine. Crossfield seeks to hold the supplier of that component part, not the manufacturer of the component part and not the designer of the larger machine system, liable.

■ The Missouri courts have not yet addressed the situation of a supplier's liability where a non-defectively designed or manufactured component part is alleged to become unreasonably dangerous only because of the supplier's failure to warn of a hazard that might arise after the part is integrated into a larger machine system. We conclude, however, that the Missouri courts would not extend liability so far as to hold the component part supplier responsible.

■ Under either theory of recovery, strict liability failure to warn or negligent failure to warn, an essential element is product failure or malfunction. *Sperry II*, 804 F.Supp. at 1140; *Spuhl*, 795 S.W.2d at 580. There was no evidence presented in this case that the chain malfunctioned or failed to perform as intended. The chain did not break or snap due to a defective condition, thereby injuring the plaintiff. Rather, the chain operated as it was meant to in the greater machine system, and the plaintiff was injured while working with the system as designed. Crossfield's expert admitted that the chain as it was originally shipped by Quality was not unreasonably dangerous. Tr. Vol. III at 195–96. He stated that it only becomes dangerous when integrated into the larger machine system. Therefore, the chain, standing

alone, is not an inherently dangerous product.

In fact, much of the plaintiff's expert testimony focused on the dangerous nature of the machine as opposed to the chain specifically. For example, Crossfield's expert stated: "It would be my professional opinion that the type of hazard and risk that was associated *with this machine* would not be readily recognized by the workers who would be expected to perform the process, or even on [sic] supervisory personnel." Tr. Vol. III at 129 (emphasis added). Even while the expert was opining that the chain was unreasonably dangerous, his testimony centered on the operation of the larger machine system:

> Q. Mr. Sevart, based upon your review of the evidence in this case and your research on the subject of product design, do you have an opinion as to whether or not the chain, this particular chain, when used on a chitterling cleaning machine of the configuration that was there at the time of Sandra Crossfield's injury on June 2, '98—1988, was in an unreasonably dangerous condition when left unguarded?
>
> A. Yes, I have an opinion.
>
> Q. And what is your opinion?
>
> A. It'd be my professional opinion that it was.
>
> Q. Why is that your opinion?
>
> A. All right. First of all, this type of operation is highly repetitive. This machine is capable of processing 300 hogs an hour, which works out to be like 2400 a day. Each chitlin represents two or three pieces. The operator has to pick up many, many pieces; it's a highly repetitive process. Such tasks that are highly repetitive are very difficult for an operator to execute safely 100 percent of the time.
>
> Now secondly, is that the cost of providing the guarding, it was very, very minimal compared to the benefit. And the guarding would not interfere with the use of the machine, so that there really was no benefit to be gained by operating the machine having it designed without guarding. . . .

Tr. Vol. III at 135–36.

Furthermore, when testifying about the steps that should have been taken to ensure a safer environment for the workers, the expert's opinions again concentrated on the machine itself:

> Q. . . . Do you have an opinion as to whether or not *the chain* that was supplied by the defendant, Quality Control Equipment Company, for use on the chitterling machine, which injured Sandra Crossfield, required a warning for safe operation?
>
> A. Yes, I do.
>
> Q. And what is that opinion?
>
> A. That there should've been a warning *on the machine.*

Tr. Vol. III at 149 (emphasis added). The expert testified that a warning decal should have been placed on the machine. Tr. Vol. III at 151. Finally, when describing the type of guard mechanism he recommended, the expert testified that it should be a hood attached to the machine. This hood would encase the hazardous components and would automatically shut the machine off if raised. Tr. Vol. III at 152. This was exactly the kind of additional safety feature that Quality introduced onto its machines manufactured after 1985–86.

This expert testimony relates to the design of the machine and the fact that no guards were in place on the machine. By the expert's own opinions, the dangerousness in this system came from the design of the machine, not from the chain alone. Therefore, the primary duty was owed by the designer of the machine, not the supplier of only one component part, in itself a non-defective element.

To impose responsibility on the supplier of the chain in the context of the larger defectively designed machine system would simply extend liability too far. This would mean that suppliers would be required to hire machine design experts to scrutinize machine systems that the supplier had no role in developing. Suppliers would be forced to provide modifications and attach warnings on machines which they never designed nor manufactured. Mere suppliers cannot be expected to guarantee the safety of other manufacturers' machinery.

A pair of recent decisions from the Eastern District of Missouri, *Sperry v. Bauer-*

*meister, Inc.,* 786 F.Supp. 1512 (E.D.Mo. 1992) (*Sperry I* ), and *Sperry II,* 804 F.Supp. 1134, are very instructive in this case. *Sperry* involved an injury to a worker cleaning out a spice milling machine. The worker sued the alleged manufacturer of the machine, Bauermeister, under theories including strict liability and negligent failure to warn. Bauermeister in turn filed a third-party complaint against Micron, the supplier of a rotary airlock, a component part alleged to be defective by Bauermeister. In *Sperry I,* the district court held that under current Missouri products liability law, Micron could not be liable. The court wrote: "Although Missouri has not addressed this issue directly, it has embraced certain theories of product liability which leads this Court to opine that the Missouri courts would agree with the majority of jurisdictions that hold a non-defective component part manufacturer should not be held liable for the incorporation of the part into a defectively designed product." *Sperry I,* 786 F.Supp. at 1516; *see also Sperry II,* 804 F.Supp. at 1140. The court cited cases from many other jurisdictions to support its conclusion. *See, e.g., Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 49 (6th Cir.1989); *Koonce v. Quaker Safety Prods. & Mfg.,* 798 F.2d 700, 715 (5th Cir.1986); *Cropper v. Rego Distrib. Ctr., Inc.,* 542 F.Supp. 1142, 1156 (D.Del.1982). The court noted further that a component part supplier should not be cast in the role of insurer for any accident that may arise after that component part leaves the supplier's hands. *Sperry I,* 786 F.Supp. at 1517; *Linegar v. Armour of Am.,* 909 F.2d 1150, 1155 (8th Cir.1990). Thus, the *Sperry I* decision supports the principle that manufacturers of component parts which are not defective standing alone cannot be liable for accidents taking place after the part has been integrated into a larger system which they played no part in building.

In *Sperry II,* the court elaborated on this general idea. Bauermeister, it turns out, was only a supplier of different component parts for the spice milling system which was ultimately solely designed, assembled, and installed by plaintiff's employer, Spicecraft. Bauermeister offered to sell a complete, integrated system, but Spicecraft rejected the offer. Bauermeister, therefore, played no role in the ultimate design of the spice milling system and only supplied parts. In granting summary judgment in favor of Bauermeister, the district court held:

> Plaintiff Sperry cannot support his claims for negligent failure to warn or strict liability failure to warn because he has no evidence that the component parts supplied by defendant were in any way defective or that a lack of warning rendered any of the component parts supplied by defendant defective or unreasonably dangerous. Furthermore, plaintiff cannot establish liability of defendant because the lack of a warning rendered the overall mill system defective. Defendant had no connection with the design or installation of the electrical system which would have included an interlock safeguard and/or a warning light; consequently it had no duty to warn plaintiff of any dangerous condition of the electrical system or the overall design of the mill. Finally, plaintiff has no evidence that any of the component parts sold by defendant failed or malfunctioned causing plaintiff's injury.

*Sperry II,* 804 F.Supp. at 1140.

The *Sperry* cases are very close to the present case. In both situations, the defendants supplied component parts which were in and of themselves non-defective and which did not fail to perform as designed. An injury only occurred after the component parts were integrated into a greater machine system that contained a design defect. Furthermore, the integrated machine was designed and assembled by someone other than the component part supplier. The *Sperry* decisions lead us to conclude that the defendant in this case, Quality, had no duty to warn as a matter of law.

*Wright v. Federal Mach. Co.,* 535 F.Supp. 645 (E.D.Pa.1982), presented a factual situation also very analogous to the present case. In *Wright,* the plaintiff sued the supplier of replacement rollers for a leather press. The supplier, defendant Federal Machine Company, did not manufacture or design the rollers; it simply purchased parts and a mailing list from the original manufacturer when the manufacturer went out of business. No one

from Federal had ever visited the site of the leather press, nor had Federal installed the rollers into the press. The *Wright* court wrote:

Plaintiff does not allege a manufacturing defect in the rollers sold by Federal but claims that there is a design defect because Federal did not provide a guard or other safety device for the press and did not give a warning about the risk of not having a safety guard. The absence of safety devices or warnings may be design defects in the press but they are not design defects in the rollers.

. . . .

Federal did not manufacture or sell the complete press or an assembly where a safety guard would normally be attached. The two replacement rollers sold by Federal became dangerous only when they were installed ... in the press.

*Wright,* 535 F.Supp. at 649–50. Because the manufacturing defect was in the design of the integrated product and not in the component part, the component part supplier was not liable. *Wright,* 535 F.Supp. at 650.

Again these same principles control our situation. The chain is not unreasonably dangerous in and of itself, but is only a constituent of a dangerously designed product. The Sixth Circuit has noted, "extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer." *Childress,* 888 F.2d at 49. We do not believe the Missouri courts would extend liability that far, and we will not do so in the absence of any indication that they would. We agree with the sentiments expressed by the Michigan Court of Appeals:

The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.

*Jordan v. Whiting Corp.,* 49 Mich.App. 481, 212 N.W.2d 324, 328 (1973), *rev'd on other grounds,* 396 Mich. 145, 240 N.W.2d 468 (1976). We believe that the Missouri courts would follow these well-reasoned decisions from other jurisdictions.

In addition, the chain supplied by Quality was manufactured and sold specifically to run in a Strickler–DeMoss chitterling cleaning machine. Quality had no part in designing or manufacturing the chain, just as it had no part in designing or manufacturing the machine into which the chain was placed. Many cases from other jurisdictions support the conclusion that a supplier, who did not design the finished product, cannot be held liable for providing a component part which is specially produced to the specifications of the larger machine system manufacturer. *See, e.g., Taylor v. Paul O. Abbe, Inc.,* 516 F.2d 145, 148–49 (3d Cir.1975); *Spangler v. Kranco, Inc.,* 481 F.2d 373, 375 (4th Cir.1973); *Frazier v. Materials Transp. Co.,* 609 F.Supp. 933, 935–36 (W.D.Pa.1985); *Orion Ins. Co. v. United Technologies Corp.,* 502 F.Supp. 173, 178 (E.D.Pa.1980); *Searls v. Doe,* 29 Ohio App.3d 309, 505 N.E.2d 287, 289–90 (1986).

This general principle underscores our holding in this case. Here the supplier, Quality, provided a particular component based solely on the specifications of a larger machine manufacturer. Quality does not have a duty to verify the safety of products, designed by others, for which it provides non-defective component parts uniquely made to the designer's specifications. *See Childress,* 888 F.2d at 49.

Finally, we note that any liability premised on the theory that Quality is the successor to the original chitterling cleaning machine manufacturer, Strickler–DeMoss, was abandoned at trial. The only theory under which Crossfield attempts to hold Quality liable is as a supplier of the component part, the chain. As we have shown, liability cannot attach based on that theory.

## III. CONCLUSION

We reiterate that Quality is neither a manufacturer nor a designer of either the chain or the chitterling cleaning machine. By the

plaintiff's expert's own testimony, the chain was not dangerous in and of itself and only contributed to a hazard when integrated into the larger machine system. Furthermore, the chain was specifically created to fit the original specifications of the chitterling cleaning machine manufacturer. In this situation, we hold as a matter of law that Quality had no duty to warn of the potential hazard.

Accordingly, we reverse.