675 A.2d 620

GERARDO ZAZA AND FRANCES ZAZA, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. MARQUESS AND NELL, INC., A CORPORATION D/B IN NEW JERSEY; CALGON CARBON COMPANY, A COMPANY D/B IN NEW JERSEY; WILLIAM MERZ; AND BRENNAN COMPANY, INC., A COMPANY D/B IN NEW JERSEY, DEFENDANTS, AND INTERNATIONAL SHEET METAL & PLATE MFG., INC., A NEW JERSEY CORPORATION, DEFENDANT–APPELLANT.

Argued January 3, 1996—Decided May 9, 1996.

*John J. Scanlon* argued the cause for appellant (*Scanlon & Heim,* attorneys).

*Alfred D. Alvarez* argued the cause for respondents (*Mr. Alvarez,* attorney; *Mr. Alvarez* and *Andrew S. Maza,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the question of whether under the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –7, a component part fabricator that builds a system component in accordance with the specifications of the owner, which component is not dangerous until it is integrated into the larger system, can be held strictly liable to an injured employee for the failure of the owner, installer-assembler, and training consultant to install safety devices and provide warnings. The Appellate Division found that such a fabricator could be held strictly liable. We now reverse.

I

On January 28, 1990, plaintiff Gerardo Zaza[1], an employee of Maxwell House Coffee (Maxwell House), a division of General Foods Manufacturing Corporation, discovered a clog in a quench tank located in the Hoboken plant. While working to repair the quench tank, hot molten water and carbon within the quench tank overflowed and landed on plaintiff's back, arms and upper extremities, causing second degree burns over twenty-one percent of plaintiff's body.

The quench tank is an integral part of a large, complex manufacturing process—the Maxwell House trecar-carbon regeneration system—which is used to produce decaffeinated coffee beans. The system contains a multiple hearth furnace, a quench tank, and numerous pipes, watering screws, scrubbers and fans. All of those parts must be fully integrated and assembled in order to create a properly working trecar-carbon regeneration system. It is a two-fold system. In the top portion of the system, the ultimate coffee product is made, and a byproduct (carbon) is reclaimed in the lower portion. The quench tank is located in the lower portion where the carbon regeneration process takes place. After the basic coffee product has been made in the top portion, the carbon, which has been heated in the multiple hearth furnace to 1700 degrees fahrenheit, leaves the furnace through a large tube and enters the quench tank. At the same time the molten carbon enters the quench tank, cool water is pumped into the quench tank at the rate of twenty-two gallons per minute. The superheated carbon-water mixture moves through the quench tank for approximately thirty minutes, then exits the tank through two pipelines, and finally comes to rest in separate storage tanks where it is kept for future processing.

The initial designs for the quench tank were prepared by Maxwell House and were submitted to the engineering firm of

---

[1] Mr. Zaza and his wife are both plaintiffs but we refer only to Mr. Zaza as plaintiff.

Marquess and Nell, Inc., (Marquess) who prepared the final design plans. Marquess contracted with defendant International Sheet Metal & Plate Mfg., Inc. (International) for a fabricated quench tank. Maxwell House hired Brennan Company, Inc. (Brennan) to assemble and integrate the trecar-carbon regeneration system. Calgon Carbon Company (Calgon) was hired to prepare training materials on how to operate the system and to educate Maxwell House employees in the use of the trecar-carbon regeneration system. William J. Merz, an engineer employed by Calgon, conducted a training session for Maxwell House employees on how to use the trecar-carbon regeneration system, including the quench tank. Plaintiff attended the training session.

The specifications on which defendant bid for the quench tank did not require that the fabricator prepare or install any safety devices. Rather, the specifications called for the fabricator to cut holes for the safety devices. The quench tank fabricated by defendant is best described as a stainless steel tank with holes in it. The tank also contains six flanges, which are devices used to hold pipes in place. The quench tank was sold to Maxwell for $7,400. When it was delivered to Maxwell House, professional installers had to connect water ingress piping, carbon extrusion piping and water discharge piping before it could be made operational.

The final plans and specifications for the trecar-carbon regeneration system incorporated three safety devices designed to avoid an overflow of the molten fluid out of the quench tank. These safety devices were to be installed by Maxwell House and Brennan. The devices included a spectacle shut-off valve, a high-level fluid sensor, and an overflow pipe. The spectacle shut-off valve was designed to stop the flow of the molten carbon from leaving the hearth furnace and entering the quench tank whenever personnel were working on the quench tank or associated piping. It was supposed to be located in the chute between the hearth furnace and the quench tank. The high-level fluid sensor was designed to trigger an alarm and light whenever the fluid level in

the quench tank reached a dangerous level. The overflow pipe was to be located eight inches below the top of the quench tank and was designed to divert the fluids within the quench tank through a piping system to another location away from the user if the fluids reached a high level within the tank. It is uncontroverted that the installation of the overflow pipe would have prevented the quench tank from pouring out its molten contents on plaintiff.

Although all three safety devices were included in the design plans prepared by Marquess, none was actually in operation at the time plaintiff sustained his injuries. Brennan, the installer, claims that its function was to install and integrate the quench tank into the system based on the plans provided to it by Maxwell House, that Maxwell House decided to omit the safety devices recommended by Marquess, and that Maxwell House approved the installation. Maxwell House's decision to omit the safety devices appears to have been deliberate. Although the spectacle shut-off valve was on site and available when the tank was being installed, Maxwell House chose not to install it. When an engineer informed Maxwell House of the omission, the company chose to disregard the advice.

In June 1991, plaintiff filed this action against Marquess, Calgon, William J. Merz, Brennan, and International. The complaint against International alleged that strict liability should be imposed because the quench tank was defectively designed and lacked adequate warnings.

Motions for summary judgment were filed by Marquess, Calgon, its employee William J. Merz, and International. Plaintiff filed a motion for summary judgment, opposed defendants' motions for summary judgment and simultaneously cross-motioned for summary judgment as to defendants Marquess and International.

During oral argument on the motions for summary judgment, the trial court attempted to sort out the responsibilities of the designer (Marquess), fabricator (International), training consul-

tant (Calgon) and installer-assembler (Brennan). With respect to International's legal responsibility, the court found that:

> [Defendant] doesn't create the spectacle shutoff system, the high liquid sensor device, or the overflow pipe system. He tells me he's the fabricator who makes the holes for them. . . . And here's a sheet metal guy who prepares pieces of sheet metal that he submits to an installer who puts them together at the site, and he's got all the holes in them. And you're [plaintiff's counsel] saying that he's got a non-delegable duty to the consumer or to the injured party to see to it that the installer puts it in, the manufacturer install his sheet metal properly before it is functional; is that what you're saying?

In granting International's motion for summary judgment, the court reasoned:

> With respect to Defendant International, the colloquy that we've had, the discussion we've had on the record is very enlightening and illuminating because it does not appear that the manufacturer of sheet metal that is not the manufacturer of an integrated machine should be held to the same degree of responsibility that one who manufactures a total machine and that machine when it's put into the stream of commerce creates injury should be held to. The standard for an individual who creates a component part of a machine is whether or not they have properly manufactured that component part. The plaintiff's expert does not indicate that any part of the sheet metal itself, the work done by International caused this unit to be used without the proper safety devices. Therefore, I don't find that there is any material issue of fact with respect to the work that was done by International. Therefore, the motion for the Summary Judgment is granted with respect to International.

At a hearing on a motion for reconsideration, the trial court further elaborated on its rationale for granting International's motion for summary judgment. With respect to the design defect, the court opined:

> It was uncontroverted that International Plate Metal did do whatever design they were required to perform, whatever fabricating of the holes and cutouts that were required in the specifications that were given to them by Ma[r]quess & Nell, the designer. There was never any suggestion that International Sheet Metal & Plate Manufacturer was responsible for supervision of the installation. They merely had to do their work and thereafter others were required to install all of the pipes and the safety devices, and the fittings, and the sealants that were necessary to make this skeleton a viable component in this overall unit.

Concerning the alleged failure to warn, the court found:

The plaintiff says the defendant failed to provide warnings. There was no way that the fabricator could even know what the final looks of that machine would be or what type of use the machine would entail or what component parts would be added to that tank in order to make it into a manufacturing instrument, into an operative working unit.

Brennan and Calgon settled. Plaintiff then appealed to the Appellate Division from the order granting summary judgment in favor of International. In his appeal, plaintiff argued that the quench tank was "defective" under *N.J.S.A.* 2A:58C–2 because: (1) defendant deviated from the design specifications by not incorporating an overflow pipe into the quench tank; (2) defendant failed to provide adequate warnings to Maxwell House and plaintiff; and (3) the quench tank was unsafe for its intended purpose.

The Appellate Division, by a 2–1 majority, reversed the grant of summary judgment in favor of International and remanded the matter to the trial court for further proceedings. According to the Appellate Division majority, whether the quench tank was a complete product or a component part in the trecar-carbon regeneration system was irrelevant. The majority explained that:

[International] had a duty to furnish a safe product, the breach of which triggers strict liability.... The fact that defendant may have understood that Maxwell House would install the safety devices in the holes it cut did not relieve defendant from potential liability.... That fact only relates to the issues of proximate cause.

According to the majority, if installation was not feasible or premature, defendant had a duty to warn foreseeable users— Maxwell House and Maxwell House employees—of the omission and of the dangers of operating the quench tank prior to the installation of the safety devices.

The dissenting member found that it was not "reasonable" to hold a sheet metal fabricator strictly liable for a tank that it built in full accordance with the plans and specifications supplied by the assembler. The dissent opined that it was Maxwell House's

obligation to install the safety devices required by the plans before putting the tank into operation.

The dissenting member was also unequivocal in his belief that a warning was not necessary. He wrote:

> It [a warning] makes no sense to me. This was not a finished product placed in the stream of commerce. It was a special order, placed after competitive bidding. International has not been shown to have deviated from the specifications and standards required of it in its contract. It is not reasonable to require that warnings be placed on the tank by International as the plans of Maxwell House put all on notice that three safety devices were required.... Why was a warning necessary when engineers who were on the site for the very purpose of seeing to it that the plans were followed and that the operation was carried out safely.... Further, a warning would not have served to put the plaintiff on notice. This was not a machine or tool that was put into the hands of a user or worker. It was part of a system installed within a plant as part of a fully designed and integrated manufacturing process.

Defendant appeals to this Court as of right. *R.* 2:2–1(a).

## II

We first focus on whether a fabricator, who produces a non-defective component part for an integrated manufacturing system in accordance with the designs and specifications of the owner, has a legal duty to ensure that the owner and installer-assembler properly integrate the component into the system.

■ The Products Liability Act, (the Act), *N.J.S.A.* 2A:58C–1 to –7 applies. The Legislature passed the Act as "remedial legislation to establish clear rules [in] . . . actions for damages for harm caused by products, including certain products under which liability is imposed." *N.J.S.A.* 2A:58C–1. The Act has been interpreted as evincing a legislative policy "to limit the expansion of products-liability law." *Roberts v. Rich Foods, Inc.*, 139 *N.J.* 365, 374, 654 *A.*2d 1365 (1995) (quoting *Shackil v. Lederle Labs.*, 116 *N.J.* 155, 187, 561 *A.*2d 511 (1989)). The Legislature intended for the Act to limit the liability of manufacturers so as to "bal-

ance[ ] the interests of the public and the individual with a view towards economic reality." *Shackil, supra,* 116 *N.J.* at 188, 561 *A.*2d 511 (quoting *Shackil v. Lederle Labs.,* 219 *N.J.Super.* 601, 643, 530 *A.*2d 1287 (1987) (Shebell, J.A.D., dissenting), *rev'd.,* 116 *N.J.* 155, 561 *A.*2d 511 (1989)). *See also DePrimo v. Lehn & Fink Prods. Co.,* 223 *N.J.Super.* 265, 273, 538 *A.*2d 461 (Law Div.1987) (finding that in interpreting the Act, courts should "as a matter of sound judicial policy, ... apply this conservative legislative policy").

The Act does not "codify all issues relating to product liability" rather, the Legislature intended it to address "matters that require[d] clarification." *Roberts, supra,* 139 *N.J.* at 374, 654 *A.*2d 1365 (quoting *N.J.S.A.* 2A:58C–1). The Act left unchanged the three theories under which a manufacturer or seller may be held strictly liable for harm. *Jurado v. Western Gear Works,* 131 *N.J.* 375, 384, 619 *A.*2d 1312 (1993); *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 94–95, 577 *A.*2d 1239 (1990); *Fabian v. Minster Mach. Co.,* 258 *N.J.Super.* 261, 271, 609 *A.*2d 487 (App. Div.), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220 (1992). Specifically, *N.J.S.A.* 2A:58C–2 provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.
>
> [*Ibid.*]

## III

Under strict products liability a manufacturer has a duty to ensure that the products it places into the stream of commerce are safe when used for their intended purposes. *N.J.S.A.* 2A:58C–2. The focus in a strict liability case is on the product

itself. *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 238, 432 *A.*2d 925 (1981); *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169–70, 406 *A.*2d 140 (1979). A prerequisite of any recovery under strict tort liability is the existence of a defective condition. To succeed under a strict liability design-defect theory, a plaintiff must prove "that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." *Feldman v. Lederle Labs.*, 97 *N.J.* 429, 449, 479 *A.*2d 374 (1984); *see Becker v. Baron Bros.*, 138 *N.J.* 145, 151, 649 *A.*2d 613 (1994); *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179, 463 *A.*2d 298 (1983); *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394, 451 *A.*2d 179 (1982). An inference of defectiveness may not be drawn from the mere fact that someone was injured. Liability should be imposed only when the manufacturer is responsible for the defective condition. *Taylor v. Paul O. Abbe, Inc.*, 516 *F.*2d 145, 147 (3d Cir.1975); *see also O'Brien, supra*, 94 *N.J.* at 179–80, 463 *A.*2d 298 (citations omitted) ("The necessity of proving a defect in the product as part of the plaintiff's *prima facie* case distinguishes strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of a product.")

The term "defect" is not self-defining and has no universally accepted meaning suitable for every strict products liability case. *Soler v. Castmaster*, 98 *N.J.* 137, 145, 484 *A.*2d 1225 (1984); *O'Brien, supra*, 94 *N.J.* at 180, 463 *A.*2d 298. Defects are classified as design defects, manufacturing defects or inadequate warning defects. *Feldman, supra*, 97 *N.J.* at 449, 479 *A.*2d 374. Generally, the emphasis in strict products liability analysis is on the safety of the product, not on the reasonableness of the manufacturer's conduct. *Becker, supra*, 138 *N.J.* at 152, 649 *A.*2d 613 (citing *Feldman, supra*, 97 *N.J.* at 450, 479 *A.*2d 374). However, under the Act, as under the common law, the ultimate question to be resolved in design-defect and failure-to-warn cases is whether the manufacturer acted in a reasonably prudent manner in designing and fabricating a product. *Feldman, supra*, 97

*N.J.* at 451, 479 *A.*2d 374; *Fabian, supra,* 258 *N.J.Super.* at 273, 609 *A.*2d 487; William A. Dreier, New Jersey Products Liability & Toxic Torts Law et al., ¶ 1:1–2, at 2, 1995 ed. As we observed in *Feldman, supra,* 97 *N.J.* at 451, 479 *A.*2d 374:

> When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability. The question in strict liability design-defect and warning cases is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or in providing the warnings given. Thus, once the defendant's knowledge of the defect is imputed, strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct.

## IV

Plaintiff, relying on safety-devices cases such as *Michalko,* supra; *Freund,* supra; *Suter,* supra; *Cepeda v. Cumberland Engineering Co.,* 76 *N.J.* 152, 386 *A.*2d 816 (1978); *Finnegan v. Havir Mfg. Corp.,* 60 *N.J.* 413, 290 *A.*2d 286 (1972); and *Bexiga v. Havir Mfg. Corp.,* 60 *N.J.* 402, 290 *A.*2d 281 (1972), contends that International had a non-delegable duty to see that Maxwell House and its team of hired professional assemblers properly integrated the quench tank into the trecar-carbon regeneration system. But the cases cited by plaintiff involved either suits against manufacturers of finished products or rebuilders of machinery. It was within the power of the defendants in those cases to install safety devices. In contrast, the fabricator of a component part that is not inherently dangerous has no control over whether the purchaser properly installs the component part into the final system.

Where a finished product is the result of work by more than one party, a court must examine at what stage installation of safety devices is feasible and practicable. In many jurisdictions, responsibility for installing a safety device is determined by reference to three criteria: (1) the trade custom indicating the party that normally would install the safety device; (2) the relative expertise of the parties, looking to which party is best acquainted with the design problems and safety techniques in question; and (3) practicality, focusing on the stage at which installation of the device is most feasible. *See, e.g., Verge v. Ford Motor Co.,* 581

*F.*2d 384 (3d Cir.1978); *Christner v. E.W. Bliss Co.*, 524 *F.Supp.* 1122 (M.D.Pa.1981); *Ford v. International Harvester Co.*, 430 *So.*2d 912 (Fla.Dist.Ct.App.), *cert. denied*, 441 *So.*2d 631 (Fla.1983).

In *Michalko, supra,* we limited the factual inquiry for determining responsibility for the lack of a safety device to the question of practicality or feasibility of the installation of a safety device by the component manufacture.[2] We stated that *"when it is feasible* for the rebuilder of machinery or the manufacturer of component parts to incorporate a safety device and it fails to do so, the rebuilt machine or component part will be deemed to be a defective product when delivered by the manufacturer to its owner." *Michalko, supra,* 91 *N.J.* at 395, 451 *A.*2d 179 (emphasis added). Similarly, in *Bexiga, supra,* we stated:

> Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices *can feasibly be installed* by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him.
>
> [60 *N.J.* at 410, 290 *A.*2d 281 (emphasis added).]

In *Bexiga, supra,* 60 *N.J.* at 409–10, 290 *A.*2d 281, we concluded that it was practical for the manufacturer to install a safety device that could be used for all purposes of the machine, and therefore we held the manufacturer strictly liable for the plaintiff's injuries. *But see Verge v. Ford Motor Co.*, 581 *F.*2d 384 (3d Cir.1978) (holding that component part manufacturer was not responsible for including backup warning device or other safety device on cab and chassis and would not be liable for injuries caused in absence of such device, where installation of safety devices by component part manufacturer was not feasible).

A further requirement for the imposition of strict liability on a component part fabricator is that the component part reach

---

2 Custom of the trade, however, may still be admitted as evidence in determining the reasonableness of the manufacturer's decision with regard to such device, or with regard to design or warning in general. Dreier et al., *supra,* ¶ 12:1–3, 5:31.

the user without substantial change. *Michalko, supra,* 91 *N.J.* at 399, 451 *A.*2d 179. Where a component part is subject to further processing, or where the causing of the injury is not directly attributable to any defect in the component part, the fabricator is typically not subject to strict liability. *Accord City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 *Wis.*2d 641, 207 *N.W.*2d 866, 870 (1973).

## V

In its recent draft, the American Law Institute (A.L.I.) concluded that a component part manufacturer generally is not liable unless the component itself is defective or the component provider substantially participated in the design of the final product.

[I]t would be unjust, impractical, and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective. To hold a component supplier to the same liability as the seller of the integrated product would require the component seller to scrutinize another's product with respect to which the component seller has no role in developing. This would impose substantial costs on the component seller, who would have to develop sufficient sophistication to review the decisions of the business entity that already has assumed responsibility with regard to the integrated product.

[*Restatement (Third) of Torts* § 10 cmt. a (Tentative Draft No. 3, 1996) (hereinafter *Restatement,* Tentative Draft).]

The majority of courts from other jurisdictions have held that a manufacturer of a component part, which is not dangerous until it is integrated by the owner into a larger system, cannot be held strictly liable to an injured employee for the failure of the owner and/or assembler to install safety devices, so long as the specifications provided are not so obviously dangerous that it would be unreasonable to follow them. For example, in *Jordan v. Whiting Corp.,* 49 *Mich.App.* 481, 212 *N.W.*2d 324 (1973), *rev'd in part on other grounds,* 396 *Mich.* 145, 240 *N.W.*2d 468 (1976), a plaintiff brought suit against the manufacturer of component parts used in a crane. The plaintiff alleged that the assembled crane was defectively designed. However, the component parts were not in and of themselves defective. The trial court granted a directed

verdict to the component part manufacturer and the verdict was affirmed on appeal. The appellate court stated:

> The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.
>
> [*Jordan, supra,* 212 *N.W.2d* at 328.]

*See also Koonce v. Quaker Safety Products & Mfg.,* 798 *F.*2d 700, 715 (5th Cir.1986) (holding that "[i]f the component part manufacturer does not take part in the design or assembly of the final system or product, he is not liable for defects in the final product if the component part itself is not defective"); *Spangler v. Kranco, Inc.,* 481 *F.*2d 373, 374–75 (4th Cir.1973) (holding that manufacturer of crane produced to owner's specifications was not liable for injury which might have been prevented if crane had been equipped with alarm which sounded when backing up, so long as specifications provided were not so obviously dangerous that they should not reasonably have been followed); *Lesnefsky v. Fischer & Porter Co.,* 527 *F.Supp.* 951, 955 (E.D.Pa.1981) (holding that manufacturer of component parts that produces component part in accordance with specifications of buyer is not liable for part's defective design unless manufacturer has or should have knowledge that product is unsafe for intended use); *Orion Ins. Co. v. United Technologies Corp.* 502 *F.Supp.* 173, 178 (E.D.Pa.1980) (holding that manufacturer of helicopter's stationary star, that was manufactured according to specifications of a third party with superior knowledge and in which there was no manufacturing defect, not liable for design defect that arose from third party's incorporation of star into helicopter); *Mayberry v. Akron Rubber Machinery Corp.,* 483 *F.Supp.* 407, 413 (N.D.Okla.1979) (holding that where "a supplier furnishes a component part free of defects and without knowledge of the design of the end product, strict liability should not be imposed on the supplier for injury resulting from the end product design"); *Castaldo v. Pittsburgh–Des Moines Steel Company,* 376 *A.*2d 88, 90 (Del.1977) (holding manufacturer of product (storage tank), built in accordance with plans

and specifications of employer, not liable for damage occasioned by defect in specifications, unless plans are so obviously dangerous that no reasonable person would follow them); *Woods v. Graham Engineering Corp.*, 183 *Ill.App.*3d 337, 132 *Ill.Dec.* 6, 8–9, 539 *N.E.*2d 316, 318–19, *cert. denied*, 127 *Ill.*2d 644, 136 *Ill.Dec.* 611, 545 *N.E.*2d 135 (1989) (holding that component part manufacturer is liable only when responsible for design of final product or component part itself caused the injury, but component manufacturer not liable under strict liability if injury resulted from dangerous condition created by party who created final product); *Loos v. American Energy Savers, Inc.*, 168 *Ill.App.*3d 558, 119 *Ill.Dec.* 179, 522 *N.E.*2d 841, 845 (1988) (holding that absent failure to manufacture according to specifications, component part manufacturer not responsible for injuries caused by its defective design); *Molina v. Kelco Tool & Die, Inc.*, 904 *S.W.*2d 857, 861 (Tex.Ct.App.1995) (holding that component part manufacturer that manufactures a component part in accordance with buyer's specifications is free from strict liability if the part itself is not defective); *Davis v. Dresser Industries*, 800 *S.W.*2d 369, 370 (Tex.Ct.App. 1990) (holding that strict liability for component part manufacturers is limited when component part integrated into larger unit before distribution such that if component part manufacturer does not participate in the design or assembly of final system or product, manufacturer not liable for defects in final product if component part itself not defective).

## VI

In *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995), we held that in deciding a motion for summary judgment, a court is required to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a neutral factfinder to resolve the alleged disputed issue in favor of the non-moving party. Here, the parties' affidavits, depositions, testimony, and other documents

convince the Court that International had no duty to install the safety devices on the quench tank before it left its control.

Plaintiff does not allege any manufacturing defect in the quench tank itself. The quench tank was not in and of itself dangerous or defective. It was a sheet metal tank with holes in it. Specifically, plaintiff's expert alleged that "the design of the Quench tank was improper in not including an overflow pipe and/or an automatic shutoff when the superheated carbon-water mixture reached a certain level in the Quench tank." The dissent relies heavily on *Michalko, supra. Ante* at 69–73, 675 *A.*2d at 638–640. However, the facts in the present case are very different from the facts in *Michalko, supra.* In the latter case, the defendant did not contest the fact that the press it rebuilt was a defectively designed product. *Michalko, supra,* 91 *N.J.* at 395, 451 *A.*2d 179. In *Michalko, supra,* the defendant knew that safety devices were not included in the design plans and that the owner was unlikely to install safety devices on his own. *Ibid.* In contrast, plaintiff has provided no evidence that the quench tank was in a defective condition when it was delivered to Maxwell House or that International knew or should have known that Maxwell House was unlikely to install safety devices.

Moreover, it was not feasible, practical, or reasonable for defendant, a sheet metal fabricator with no prior experience in the assembly and installation of trecar-carbon regeneration systems, to attach the safety devices to the quench tank. The safety devices could not have been incorporated into the quench tank at its factory. The shut-off valve was not located in or on the quench tank, but rather in the chute between the hearth furnace and the tank. Similarly, installation of the overflow line required that the tank be first installed in Maxwell House's plant. Further, defendant lacked the expertise required to attach the safety devices and to integrate the tank into the trecar-carbon regeneration system—a system that was actually composed of separate "systems" interfacing with one another.

Furthermore, the work performed by Maxwell House and its assemblers in order to integrate the quench tank into the trecar-carbon regeneration system constituted a substantial change to the quench tank. Before it became part of the complex trecar-carbon regeneration system, the quench tank was merely an isolated unoperative component. It was not until it was installed as part of the regeneration system that it became a functional, operative product.

As stated previously, the critical issue in design-defect cases is the reasonableness of the manufacturer in marketing that design. International acted in a reasonably prudent manner in fabricating the quench tank and in delivering it to Maxwell House without incorporating the safety devices. It was not feasible or practical for defendant to attach the safety devices to the tank. International manufactured the quench tank in strict accordance with the specifications provided by Maxwell House, a knowledgeable and experienced purchaser and user. International was not the designer, manufacturer, or installer of the trecar-carbon regeneration system.

International is in the business of welding sheet metal to form tanks and other objects. It is a small family-run business located in a one-story cinder block building, that employs fifteen people, many of whom are family members. International was not expected to, and did not have, the experience or the ability to integrate and assemble all the complex parts of the total trecar-carbon regeneration system. That system was so complex that even Maxwell House, a large company skilled for years in the making of coffee, did not have enough expertise to install and assemble the system. Maxwell House found it necessary to hire Brennan, an outside company, to assemble and integrate the trecar-carbon regeneration system. Maxwell House also found it necessary to hire Calgon to prepare training manuals for its employees in the use of the trecar-carbon regeneration system and to instruct its employees on how to operate the system.

The design plans provided that the safety devices would be provided by others. International acted reasonably in relying on Maxwell House and its experienced assemblers, two entities with superior knowledge of the trecar-carbon regeneration system, to properly install the tank into the complicated system. Defendant had no control over the quench tank once it was sold and no control over the final assembly of the system. Maxwell House retained complete control over the design of the regeneration system and the quench tank's installation into the system.

It was not defendant's failure to attach the safety devices in the quench tank that caused plaintiff's injury. Defendant did exactly what it was paid $7,400 to do; its sole obligation was to produce a component part that was safe and satisfactory according to the specifications provided by Maxwell House. It did that. Under those circumstances, we find that International is not strictly liable for its failure to install the safety devices on the quench tank.

## VII

Plaintiff also asserts that International had a duty to warn of the dangers of operating the quench tank without safety devices. A failure to warn, or a failure to warn adequately, may constitute a defect in a product sufficient to support a cause of action in strict liability. *Becker, supra,* 138 *N.J.* at 151–52, 649 A.2d 613. *See also Freund, supra,* 87 *N.J.* at 236–41, 432 A.2d 925 (holding that an inadequate warning could constitute a design defect). In a failure-to-warn strict liability case, the plaintiff does not allege that the design or structure of the product was defective. Rather, the defect is in the failure to warn unsuspecting users that the product can potentially cause injury. *Coffman v. Keene Corp.,* 133 *N.J.* 581, 593–94, 628 A.2d 710 (1993) (citing *Freund, supra,* 87 *N.J.* at 242, 432 A.2d 925 (holding that "the duty to warn in the strict liability cause of action is based on the notion that absent a warning or adequate warning a product is

defective, in that it is not reasonably fit, suitable or safe for its intended purposes")).

The Product Liability Act defines a warning defect by defining its opposite, an adequate warning. *N.J.S.A.* 2A:58C–4 provides:

> In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction. An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used . . .
>
> [*Ibid.*]

According to the Products Liability Act, an adequate warning is one that a reasonably prudent person in the same or similar circumstances would have provided. Thus, where the defect alleged is failure to warn, strict liability analysis becomes similar to negligence analysis. *Becker, supra,* 138 *N.J.* at 153, 649 *A.*2d 613; *Feldman, supra,* 97 *N.J.* at 450–51, 479 *A.*2d 374. The major question in such cases is whether, "assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in . . . providing the warnings given." *Feldman, supra,* 97 *N.J.* at 451, 479 *A.*2d 374.

The general rule is that a manufacturer of a component part will not be held strictly liable for failure to warn where the danger involved is not foreseeable. *See, e.g., Cropper v. Rego Distribution Center, Inc.,* 542 *F.Supp.* 1142, 1156 (D.Del.1982) (holding that component part manufacturer was not liable for failing to place in its catalog warning of dangers involved in using component part in connection with unloading riser, on ground that manufacturer could not be expected to foresee every possible misuse to which part might be put); *Mayberry v. Akron Rubber Machinery Corp.,* 483 *F.Supp.* 407, 413–14 (N.D.Okla.1979) (holding that supplier of component parts which were not defective did not have duty to warn subsequent product manufacturer and

employees of danger that might arise after components were assembled according to manufacturer's exclusive design); *Temple v. Wean United, Inc.*, 50 *Ohio St.*2d 317, 364 *N.E.*2d 267, 272 (1977) (holding duty to warn does not extend to speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous depending on integration into unit designed and assembled by another); *Shawver v. Roberts Corp.*, 90 *Wis.*2d 672, 280 *N.W.*2d 226, 230–33 (1979) (holding that where defect in conveyor that caused injury to worker arose because of location of controls, where component part manufacturer had no involvement in design or location of controls, and where buyer incorporated product safety features in equipment which it manufactured, there was no duty on part of component part manufacturer to warn of possible dangers of conveyor being used while worker was standing on it); *accord Strimbu v. American Chain & Cable Co.*, 516 *F.*2d 781 (6th Cir.1975); *Foecker v. Allis–Chalmers*, 366 *F.Supp.* 1352 (E.D.Pa. 1973); *Munger v. Heider Mfg. Corp.*, 90 *A.D.*2d 645, 456 *N.Y.S.*2d 271 (1982).

The majority of jurisdictions also hold that a supplier of a component part that does not contain a latent defect has no duty to warn the subsequent assembler of any danger that may arise after the components are assembled. *Mitchell v. Sky Climber Inc.*, 396 *Mass.* 629, 487 *N.E.*2d 1374, 1376 (1986); *see Frazier v. Materials Transp. Co.*, 609 *F.Supp.* 933 (W.D.Pa.1985); *Lockett v. General Elec. Co.*, 376 *F.Supp.* 1201 (E.D.Pa.1974), *aff'd*, 511 *F.*2d 1394 (3d Cir.1975); *Castaldo v. Pittsburgh–Des Moines Steel Co.*, 376 *A.*2d 88 (Del.1977). For example, in *Munger, supra*, an employee of the Scott Paper Company was injured when the arm of a tension roll assembly in a paper machine fell upon him. The injured employee sued the four corporations that manufactured various components of the paper machine. The plaintiff argued that each of the component part manufacturers had a duty to foresee and warn employees that Scott might not post appropriate warnings. The court disagreed, holding that

in the absence of any proof that the component designs were defective or that the parts were wrongfully manufactured, no public policy can be served by imposing liability on a manufacturer of specialized parts of a highly technical machine, particularly when, as here, the parts were created in accordance with the design, plans and specifications of the owner and assembler of the unit.

*Id.* 456 N.Y.S.2d at 273. *Accord Sperry v. Bauermeister, Inc.*, 804 *F.Supp.* 1134 (E.D.Mo.1992), *aff'd*, 4 *F*.3d 596 (8th Cir.1993); *Frazier v. Materials Transp. Co.*, 609 *F.Supp.* 933 (W.D.Pa.1985); *Orion Ins. Co. v. United Technologies Corp.*, 502 *F.Supp.* 173 (E.D.Pa.1980).

The prevailing view is that a manufacturer of a component part, not dangerous in and of itself, does not have a duty to warn an employee of the immediate purchaser of the component where the immediate purchaser is aware of the need to attach safety devices. *Restatement*, Tentative Draft § 10 cmt. b. For example, in *Crossfield v. Quality Control Equipment Co.*, 1 *F*.3d 701, 704 (8th Cir.1993), the court held that, under Missouri law, the supplier of a non-defective chain for use in a machine that malfunctioned did not have a duty to warn. The court stated:

To impose responsibility on the supplier of the chain in the context of the larger defectively designed machine system would simply extend liability too far. This would mean that suppliers would be required to hire machine design experts to scrutinize machine systems that the supplier had no role in developing. Suppliers would be forced to provide modifications and attach warnings on machines that they never designed nor manufactured. Mere suppliers cannot be expected to guarantee the safety of other manufacturers' machinery.

[*Ibid.*]

Similarly, in *Lesnefsky v. Fischer & Porter Co.*, 527 *F.Supp.* 951 (E.D.Pa.1981), the court held that a manufacturer of a control panel for a brewery cooker was not liable for injuries sustained by an employee of the brewery where it appeared that the control panel was manufactured according to the brewery's specifications, the brewery had superior knowledge about the operations of such equipment, and the brewery maintained complete control over the installation of the equipment. The plaintiff, an employee of the brewery, was injured when boiling water spilled out of an access port on the cooker. *Id.* at 953. The cooker was operated by a

control panel manufactured by the defendant pursuant to the specifications provided by the brewery. *Ibid.* The plaintiff argued that the defendant was liable for not designing a temperature override control or a shut-off valve and because the defendant had a duty to warn the user of the inherent risks involved in operating the cooker without such safety devices. *Ibid.* The component part manufacturer alleged that it was not liable since it did not design, manufacture or install the steam valve or hatch cover, the parts which caused the plaintiff's injuries. *Ibid.* The court agreed, stating that the component part was not defective and there was no evidence that the part was so obviously dangerous that the manufacturer had an obligation to warn the ultimate user of the risk, or to refuse to manufacture the panel without making modifications. The court also noted that the manufacturer lacked the expertise required to recognize risks which might arise in the operation of the control panel in the brewery. *Id.* at 954.

Likewise, in *Orion Ins., Co. v. United Technologies Corp.,* 502 *F.Supp.* 173 (E.D.Pa.1980), the court addressed a similar situation. There, the court determined that a manufacturer of a component part, a helicopter star, which was manufactured according to the specifications of an assembler with superior knowledge and in which there was no manufacturing defect, was under no duty to warn the user of a design defect, where the component part manufacturer had no knowledge of the defect. The court noted that (1) there was no manufacturing defect in the component, (2) the assembler set the specifications for the component, (3) the component was properly inspected to ensure that it met those specifications, (4) the assembler was a sophisticated purchaser, and (5) as a matter of law it was reasonable for the component-part manufacturer to rely upon the assembler's specifications. *Id.* at 177.

As the court properly observed in *Orion, supra:*

[N]o public policy can be served by imposing a civil penalty on a manufacturer of specialized parts for a highly technical machine according to the specifications supplied by one who is expert at assembling these technical machines, who does so without questioning the plans or warning of the ultimate user. The effect of such a

decision on component parts manufacturers would be enormous. They would be forced to retain private experts to review an assembler's plans and to evaluate the soundness of the proposed use of the manufacturer's parts. The added cost of such procedure both financially and in terms of stifled innovation outweighs the public benefit of giving plaintiffs an additional pocket to look to for recovery. I believe the better view is to leave the liability for design defects where it belongs and where it now is—with the originator and the implementer of the design—the assembler of the finished product.

[502 *F.Supp.* at 178.]

Holding defendant liable would impose on a component part fabricator, whose products were built in accordance with the designer's specifications and whose part when it left defendant's plant was not defective, the duty to investigate whether the use of its non-defective product would be made dangerous by the integration of that product into the complex system designed and installed by experts. Component fabricators would become insurers for the mistakes and failures of the owners and installers to follow their own plans. Defendant would have to retain an expert to determine whether each and every integrated manufacturing system that incorporates one of its sheet metal products is reasonably safe for its intended use. In *Bond v. E.I. DuPont De Nemours & Co.*, 868 *P*.2d 1114, 1120 (Colo.App.1993), the court in holding that a seller of Teflon integrated by the manufacturer in a prosthesis had no duty to warn observed: "there is little social utility in placing the burden on a manufacturer of component parts or supplier of raw materials against injuries caused by the final product when the component parts or raw materials themselves were not unreasonably dangerous." *See also Kealoha v. E.I. DuPont de Nemours & Co.*, 844 *F.Supp.* 590, 594 (D.Hawai'i 1994) ("Permitting plaintiffs to maintain a suit against the bulk supplier of inherently safe raw materials would lead to absurd consequences: there would be no end to potential liability if every manufacturer of nuts, bolts and screws could be held liable when this hardware was used in a defective product.").

In failing to provide any warning on the use of the quench tank defendant acted as "a reasonably prudent person in the same

or similar circumstances ... taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used ...," would have acted. *N.J.S.A.* 2A:58C–4. Even if defendant wanted to provide a warning, there is no suitable location on the quench tank for a warning. The quench tank is not a single unit designed to come into contact with workers. Moreover, plaintiff did not produce any evidence that the tank was so obviously dangerous that International had an obligation to warn the users of the trecar-carbon regeneration system. Maxwell House's plans called for the installation of safety devices, and professionals were hired to ensure that the plans were followed. In that context, to require a component part manufacturer to warn of a danger of which the installer, the engineers, the owner, and the company hired to train the employees were already aware would be pointless. The duty to warn does not extend to the speculative anticipation of how component parts that are not defective can become potentially dangerous, depending on the nature of their integration into a complex system designed and assembled by another. Furthermore, knowing that Calgon was hired to train Maxwell House employees on the proper use of the trecar-carbon regeneration system, a reasonable fabricator would not have concluded that additional warnings were necessary. Indeed, plaintiff underwent two weeks of training from Mr. Merz, a Calgon instructor, on how to operate the trecar-carbon regeneration system.

## VIII

Because the quench tank was not defectively designed and defendant had no duty to warn, defendant's motion for summary judgment should have been granted. We therefore need not and do not reach the issue of whether the defect in the quench tank proximately caused the accident. In *Michalko, supra,* we observed, however, that "under certain circumstances the subsequent failure by an owner of a machine to provide a particular safety device could constitute a supervening and independent

proximate cause of an accident resulting from the lack of such device." 91 *N.J.* at 400 n. 3, 451 *A.*2d 179. *See also Coffman, supra,* 133 *N.J.* at 608, 628 *A.*2d 710 ("[i]f an employer's subsequent course of misconduct is an independent cause of an employee's injury, the absence of a warning itself may have too remote a causal connection to the injury").

In considering whether Maxwell House's failure to install properly the quench tank constitutes a supervening and independent proximate cause of the accident, the trial court should be mindful of the words of Justice Hall in *Caputzal v. Lindsay Co.,* 48 *N.J.* 69, 77, 222 *A.*2d 513 (1966):

Utilization of [the] term [proximate cause] to draw judicial lines beyond which liability will not be extended is fundamentally ... an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based "upon mixed considerations of logic, common sense, justice, policy and precedent." *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734, 119 *A.* 273 (Sup.Ct.1923), *aff'd o.b.,* 98 *N.J.L.* 893, 121 *A.* 926 (E. & A. 1923).

[*Ibid.*]

## IX

Products liability law is a matter of public policy.

[P]rinciples of public policy, the foundation that undergirds legal responsibility, are appropriate considerations in the strict liability context. *Soler, supra,* 98 *N.J.* at 153–154, 484 *A.*2d 1225; *Michalko v. Cooke Color & Chem. Corp., supra,* 91 *N.J.* at 398, 451 *A.*2d 179. These principles are especially germane when the asserted misconduct of persons other than the manufacturer bears upon the imposition of ultimate responsibility for eventual accidental harm. Public policy and fairness concerns consequently must influence a court's analysis of the relevant evidence bearing upon causation.

[*Brown v. United States Stove Co., supra,* 98 *N.J.* 155, 173, 484 *A.*2d 1234 (1984).]

Products liability law is based on concepts of fairness, feasibility, practicality and functional responsibility. We have always stressed the public's interest in motivating individuals and commercial enterprises to invest in safety to protect workers. We continue to do so. In New Jersey, manufacturers remain strictly

liable for damages caused by defectively designed products. *See Freund v. Cellofilm Properties*, 87 *N.J.* 229, 432 *A.*2d 925 (1981); *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* at 152, 406 *A.*2d 140 (1979); *Finnegan v. Havir Mfg. Corp.*, 60 *N.J.* 413, 290 *A.*2d 286 (1972); *Bexiga v. Havir Mfg. Corp.*, 60 *N.J.* 402, 290 *A.*2d 281 (1972). A component part fabricator also may be held strictly liable for injury caused by a defective component where the defect is in the component part and the part did not undergo substantial change after leaving the manufacturer's hands. *Michalko v. Cooke Color & Chem. Corp., supra*, 91 *N.J.* 386, 399, 451 *A.*2d 179 (1982); *accord States Steamship Co. v. Stone Manganese Marine*, 371 *F.Supp.* 500, 501 (D.N.J.1973); *Pust v. Union Supply Co.*, 38 *Colo.App.* 435, 561 *P.*2d 355 (1976), *modified*, 196 *Colo.* 162, 583 *P.*2d 276 (1978). However, a fabricator of a component part who builds a component of a system in accordance with the specifications of the owner, which part itself is not defective and is not dangerous until it is integrated into the larger system, has no legal duty to ensure that the owner and installer-assembler properly integrate the component into the system. So long as the specifications were not obviously dangerous, a fabricator of a component part is not strictly liable to an injured employee of the owner under the Products Liability Act.

It would serve no useful purpose to hold defendant strictly liable to plaintiff for the failure of Maxwell House and its installer-assembler, Brennan, to install the safety devices or for its failure and the failure of its trainer, Calgon, to adequately warn plaintiff. Holding defendant liable would result in an unreasonable expansion of the products liability law. "In the developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically." *Schipper v. Levitt and Sons, Inc.*, 44 *N.J.* 70, 99, 207 *A.*2d 314 (1965).

Accordingly, we reverse the judgment of the Appellate Division and grant summary judgment in favor of defendant International.

COLEMAN, J., concurring in part and dissenting in part.

I dissent from that portion of the Court's opinion that holds International had no duty to place a warning on the quench tank to alert intended users of dangers inherent in its use without safety devices. In all other respects, I concur in the Court's opinion.

The New Jersey Products Liability Act (Act) creates a failure to warn cause of action by providing that "[a] manufacturer ... of a product shall be liable in a product liability action only if the claimant proves ... that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it ... failed to contain adequate warnings or instructions...." *N.J.S.A.* 2A:58C–2. The Act also defines the standard for determining the adequacy of the warning. *N.J.S.A.* 2A:58C–4. The Act must be read in conjunction with decisional law to determine when a duty to warn has been triggered.

The thrust of the Court's opinion with respect to the absence of a duty to warn seems to be two-fold: First, the design specifications called for installation of safety devices by Maxwell House and its professional installer. Second, plaintiff produced no "evidence that the [quench] tank was so obviously dangerous that International had an obligation to warn the users of the trecarcarbon regeneration system." *Supra*, at 63, 675 *A.*2d at 635.

## I

The quench tank was fabricated by International in accordance with plans and specifications designed by Maxwell House and its engineers, Marquess and Nell, Inc. Although International was not required by the plans to prepare or install any safety devices, the plans required International to place certain holes in the tank so that three safety devices could be installed by Maxwell House's assembler, Brennan Company, Inc. The plans informed International that the intended purpose of the quench tank was use as a reservoir for a carbon-water mixture that had been heated to 1700 degrees fahrenheit. The three safety devices described in the

plans were intended to prevent the super-heated molten fluid from overflowing out of the quench tank and injuring persons in the area such as plaintiff.

The three safety devices are not designed so as to preclude use of the quench tank for its intended purpose without installation of those safety devices. The spectacle shut-off valve is similar to an electrical or manual water valve that shuts off the flow of water between point A and point B and was to be connected, according to the plans, to a certain pipe. Although the pipe was installed, the valve was not. Thus an uncontrolled stream of the super-heated molten carbon flowed from the hearth furnace into the quench tank. Similarly, the high-level fluid sensor and the overflow pipe were not designed to prevent the quench tank from being used because it lacked safety devices.

-A-

The question becomes whether the fabricator of the quench tank, who knew of its intended purpose and who knew or should have known that the quench tank could be placed into service without installation of the safety devices, thereby making the tank dangerous, had a duty to warn intended users such as plaintiff of the danger. Given the knowledge of International, the analysis "becomes almost identical to [a] negligence analysis in its focus on the reasonableness of [International's] conduct." *Feldman, supra,* 97 *N.J.* at 451, 479 *A.*2d 374; *accord Becker, supra,* 138 *N.J.* at 153, 649 *A.*2d 613.

The determination of whether to impose a duty on the manufacturer of a component part to warn of dangers inherent in using a product not equipped with proper safety devices must be informed by whether it was feasible for the manufacturer-fabricator of the quench tank to place a warning on the tank. *Michalko, supra,* 91 *N.J.* at 395, 451 *A.*2d 179. " '[I]mposing the requirements of a proper warning will seldom detract from the utility of the product.' " *Becker, supra,* 138 *N.J.* at 152, 649 *A.*2d 613 (quoting *Freund, supra,* 87 *N.J.* at 238 n. 1, 432 *A.*2d 925). In most failure-

to-warn cases, the additional cost of a warning is rather minimal and "generally [has] little, if any, effect on a product's utility." *Campos v. Firestone Tire & Rubber Co.*, 98 *N.J.* 198, 207, 485 *A.*2d 305 (1984) (citing *Freund, supra,* 87 *N.J.* at 238 n. 1, 242, 432 *A.*2d 925). An example of a case in which a warning may affect the product's utility is nonprescription drugs. *See Torsiello v. White-hall Labs.*, 165 *N.J.Super.* 311, 322–26, 398 *A.*2d 132 (App.Div.) (holding that manufacturers of nonprescription drugs must warn self-prescribing public of every risk known to the manufacturers), *certif. denied,* 81 *N.J.* 50, 404 *A.*2d 1150 (1979).

I disagree with the Court's conclusion that "there is no suitable location on the quench tank for a warning." *Supra,* at 63, 675 *A.*2d at 635. Even after the tank was incorporated into the trecar-carbon regenerating system, it remained in the open. Moreover, any difficulty in observing the warning, as well as any expense associated with a proper warning, relate to whether a duty was breached rather than whether a duty existed. *Macrie v. SDS Biotech Corp.*, 267 *N.J.Super.* 34, 42–44, 630 *A.*2d 805 (App. Div.), *certif. denied,* 134 *N.J.* 565, 636 *A.*2d 522 (1993). Under appropriate common law risk-utility factors and the affirmative defense under *N.J.S.A.* 2A:58C–3a(1), I conclude that it was practical and technically feasible for International to have placed a warning on the tank.

-B-

The next issue is whether International, given its actual and presumed knowledge of the dangers inherent in using the quench tank for its intended purpose without installation of the safety devices, "acted in a reasonably prudent manner in ... [not] providing [a] warning[ ]." *Becker, supra,* 138 *N.J.* at 153, 649 *A.*2d 613.

The duty of a component part manufacturer to warn should not be limited to products containing a manufacturing or design defect as proposed by the American Law Institute, Tentative Draft No. 3, Restatement (Third) of Torts: Products Liability, § 10 cmt. a

(1996). "The whole theory of warning failure liability is that hidden danger constitutes a distinct category of defect, separate from manufacturing and design defect. The axiomatic point is totally erased if warning failure liability lies only in cases of design defect. Courts fumble badly by finding no duty to warn unless supplies are inherently unsafe. The crucial premise of warning failure liability is precisely that hidden danger makes a product inherently unsafe." Mark McLaughlin Hager, "Don't Say I Didn't Warn You Even Though I Didn't: Why the Pro–Defendant Consensus on Warning Law Is Wrong," 61 *Tenn. L.Rev.* 1125, 1166 (1994). "The more knowledgeable the supplier [or manufacturer], the more susceptible it should be to liability." *Id.* at 1163.

Furthermore, the duty to warn in a products liability case is "consonant with a manufacturer's broader duty to place in the stream of commerce only products that are reasonably safe." *Coffman, supra,* 133 *N.J.* at 598, 628 *A.2d* 710; *Campos, supra,* 98 *N.J.* at 207–08, 485 *A.2d* 305. The Act restricts the duty to warn to "the persons by whom the product is intended to be used." *N.J.S.A.* 2A:58C–4. In *Michalko,* this Court stated that "when it is feasible for ... the manufacturer of component parts to incorporate a safety device and it fails to do so, the ... component part will be deemed to be a defective product when delivered by the manufacturer to its owner." *Supra,* 91 *N.J.* at 395, 451 *A.2d* 179.

I agree with the Appellate Division that the rule in *Michalko* should drive the determination of whether a duty to warn exists in the present case. Here, it was feasible for International to have attached a warning to the quench tank to caution intended users of the inherent dangers associated with using the tank for its intended purposes in the event Maxwell House failed to install the safety devices. In *Michalko,* this Court found that the manufacturer of a component part "is under a duty to warn owners and [intended] users of the dangers of using a particular machine if, without such a warning, the machine is not reasonably safe." *Supra,* 91 *N.J.* at 403, 451 *A.2d* 179. Furthermore, the Appellate Division properly interpreted *Michalko* to have determined that "where a safety

device cannot be installed because of further processing of the product which would render the installation of the device premature, the manufacturer ... still has the duty to warn of the dangers of operating the machine without the protective device." *Lally v. Printing Mach. Sales & Serv. Co.,* 240 *N.J.Super.* 181, 186, 572 *A.*2d 1187 (App.Div.1990) (citing *Michalko, supra,* 91 *N.J.* at 402–03, 451 *A.*2d 179).

Similarly, the Appellate Division has interpreted *Michalko* as imposing a two-step duty on the manufacturer of component parts, "namely to install a safety device if it can be installed; if it cannot, to warn the employer to install the device if possible, *and to warn the employees of the danger." Seeley v. Cincinnati Shaper Co.,* 256 *N.J.Super.* 1, 19, 606 *A.*2d 378 (App.Div.) (emphasis added), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220 (1992). "Further, the fact that the product was built according to the plans and specifications of the owner does not constitute a defense to a claim based on strict liability for [placing in the stream of commerce] a defective product when the injuries are suffered by an innocent foreseeable user of the product." *Michalko, supra,* 91 *N.J.* at 395, 451 *A.*2d 179. Nor does Maxwell House's "subsequent breach of duty [to install the safety devices] constitute a defense as a matter of law to plaintiff's strict liability claim against [the manufacturer]." *Id.* at 400, 451 *A.*2d 179.

A recent case has applied *Michalko* to facts that are similar to those in *Campos* and the present case. *Molino v. B.F. Goodrich Co.,* 261 *N.J.Super.* 85, 89–90, 617 *A.*2d 1235 (App.Div.1992), *certif. denied,* 134 *N.J.* 482, 634 *A.*2d 528 (1993). In *Molino,* a tire and rim assembly exploded while plaintiff was attaching it to his truck. *Ibid.* The court imposed a duty on the manufacturer of a truck tire to warn the intended consumer of the danger inherent in handling one of the tires after it had been mounted on a rim assembly manufactured by another company and inflated. *Id.* at 93, 617 *A.*2d 1235.

The tire, conceded by plaintiff not to be defective, was manufactured by Uniroyal and contained no warning. *Ibid.* The rim

assembly, manufactured by Firestone Tire and Rubber Company, was defective. *Id.* at 90, 93, 617 *A.*2d 1235. The court found that although the tire and rim assembly were manufactured by different companies, a jury should have been permitted to decide whether Uniroyal should have foreseen or had knowledge of the danger involved with the rim assembly used with its tires, and whether "Uniroyal's duty to provide an adequate warning of hidden dangers to reasonably foreseeable users" had been breached. *Id.* at 94, 617 *A.*2d 1235.

Although the *Molino* court described the class of consumers as the "reasonably foreseeable users" identified in *Suter, supra,* 81 *N.J.* at 169, 406 *A.*2d 140, the Act imposes liability on a manufacturer or seller of a defective product only if "the product causing the harm was not reasonably fit, suitable or safe for its intended purpose...." *N.J.S.A.* 2A:58C–2. That difference in language may suggest that the Act was intended to narrow the scope of *Suter.* Such a distinction, however, is unwarranted. *Fabian, supra,* 258 *N.J.Super.* at 273, 609 *A.*2d 487. First, the Act recognizes that the adequacy of a warning is to be determined, in part, based on "the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used." *N.J.S.A.* 2A:58C–4. Second, the Act did not intend to change the existing common law of the State. *Jurado, supra,* 131 *N.J.* at 384, 619 *A.*2d 1312. Indeed, the Senate Judiciary Committee Statement to the Act, makes clear that the Act did not intend to change *Suter.* Senate Judiciary Committee, *Statement to Senate Bill No. 2805* (July 22, 1987).

Furthermore, the public interest is best advanced by requiring the manufacturer of component parts to warn of dangers inherent in using the product without safety devices. Requiring the manufacturer to post a warning on the product furthers the public interest in that the warning serves to not only alert users of the inherent danger, but it also serves to alert intended users to check to see if safety devices have been installed. The duty to warn intended users in places of employment is particularly appropriate

because the employee's "ability to take care of himself" or herself is limited. *Cepeda, supra,* 76 *N.J.* at 199, 386 *A.*2d 816 (Schreiber, J., concurring and dissenting); *Campos, supra,* 98 *N.J.* at 208, 485 *A.*2d 305; *Bexiga, supra,* 60 *N.J.* at 412, 290 *A.*2d 281.

Simply because Maxwell House had an obligation to furnish its employees with a safe workplace did not relieve International of its duty to warn Maxwell House's employees of dangers inherent in operating the quench tank without safety devices. Indeed, plaintiff was nearly scalded to death by the overflowing quench tank, the precise hazard against which the safety devices were intended to guard if properly installed. International knew or should have known that the quench tank could be made operational without installation of the safety devices intended to protect against the very type of injury suffered by plaintiff. Whenever, as in this case, a jury can find that it is objectively foreseeable that an owner might use a product in a manner inconsistent with its intended purposes, such as by failing to install safety devices, then the manufacturer of component parts has a duty to warn the owner's employees, provided that warning could have prevented or reduced the likelihood of an accident. *Jurado, supra,* 131 *N.J.* at 386–87, 619 *A.*2d 1312; *Johansen v. Makita U.S.A., Inc.,* 128 *N.J.* 86, 94–96, 607 *A.*2d 637 (1992); *Soler, supra,* 98 *N.J.* at 151, 484 *A.*2d 1225; *Brown, supra,* 98 *N.J.* at 168–69, 484 *A.*2d 1234. I do not believe the Act was intended to alter those aspects of the common law.

Contrary to defendant's assertion, the duty to warn attaches without regard to the industry's standards. *Freund, supra,* 87 *N.J.* at 243, 432 *A.*2d 925. Accordingly, custom in the trade does not control the fabricator's duty to warn of dangers inherent in the use of the quench tank for its intended purpose without installation of safety devices. *Michalko, supra,* 91 *N.J.* at 397, 451 *A.*2d 179; *Bexiga, supra,* 60 *N.J.* at 411, 290 *A.*2d 281. Custom in the trade, however, may be of evidentiary value to a jury in determining the reasonableness of the fabricator's decision not to attach a warning to the tank. *See Mott v. Callahan AMS Mach. Co.,* 174

*N.J.Super.* 202, 206–09, 416 *A*.2d 57 (App.Div.1980) (finding that evidence of custom in trade presented a fact question for jury regarding reasonableness of decision not to warn). The fact that International may have understood that Maxwell House would install the safety devices in the holes it cut in the tank did not relieve International from potential liability based on its duty to warn. *Ibid.* That factor relates to proximate cause, not its duty to warn that I find to exist. *Ibid.*

## II

The Court's opinion also emphasizes that plaintiff did not produce evidence that the quench tank was defective for failure to warn. Plaintiff relied on the report of Angelo J. Valetutto, Engineering Consultant, plaintiff's expert. Valetutto stated in his report that plaintiff "and the other three operators were not given adequate warning on the potential for overflow of the Quench tank." Because the claim based on a duty to warn was dismissed on a summary judgment motion, plaintiff was entitled to the benefit of an inference that the above language was intended to cover International. *Brill, supra,* 142 *N.J.* at 523–24, 666 *A*.2d 146. Beyond that, expert opinion evidence is not always required to establish a need for a warning in an uncomplicated case in which a jury has enough collective experience and knowledge to assess the claim. *Butler v. Acme Mkts., Inc.,* 89 *N.J.* 270, 283, 445 *A*.2d 1141 (1982); *Macri v. Ames McDonough Co.,* 211 *N.J.Super.* 636, 643, 512 *A*.2d 548 (App.Div.1986). Moreover, the existence of a duty is a matter of law to be decided by the court. *Wang v. Allstate Ins. Co.,* 125 *N.J.* 2, 15, 592 *A*.2d 527 (1991); *Strawn v. Canuso,* 271 *N.J.Super.* 88, 100, 638 *A*.2d 141 (App.Div.1994), *aff'd,* 140 *N.J.* 43, 657 *A*.2d 420 (1995). Whether a duty exists is "largely a question of fairness or policy." *Strachan v. John F. Kennedy Mem. Hosp.,* 109 *N.J.* 523, 529, 538 *A*.2d 346 (1988); *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 *N.J.* 182, 194–95, 638 *A*.2d 1288 (1994). Because no warning was given, there is no issue about its adequacy.

Nor was an expert required on the issue of whether the absence of a warning was a proximate cause of plaintiff's injuries. Because the accident and the failure to warn in this case occurred in the employment context, plaintiff is entitled to a rebuttable presumption that he would have heeded a warning. That presumption establishes a *prima facia* case on the proximate cause issue. *Coffman, supra,* 133 *N.J.* at 599–603, 609, 628 *A.*2d 710; *Theer v. Philip Carey Co.,* 133 *N.J.* 610, 622, 628 *A.*2d 724 (1993). It serves to "shift plaintiff's burden of proof on the issue of causation as it relates to the absence of a warning." *Coffman, supra,* 133 *N.J.* at 603, 628 *A.*2d 710. Although the duty to warn is not automatically extinguished because the owner of the component part did not install safety devices, that intervening factor is another important consideration on the issue of proximate cause. *Michalko, supra,* 91 *N.J.* at 402, 451 *A.*2d 179.

I would affirm that portion of the Appellate Division decision that permitted plaintiff to proceed to trial on a theory of failure to warn.

HANDLER and O'HERN, JJ., join in this opinion.

*For reversal*—Chief Justice WILENTZ, and Justices POLLOCK, GARIBALDI and STEIN—4.

*For concurrence in part; dissenting in part*—Justices HANDLER, O'HERN and COLEMAN—3.